**SECURITIES INVESTOR
PROTECTION CORPORATION,
Plaintiff,**

v.

**STRATTON OAKMONT,
INC., Defendant.**

**Harvey R. Miller, Esq., As Trustee For
The Liquidation of Stratton
Oakmont, Inc., Plaintiff,**

v.

**Daniel Porush, Nancy Porush, Jordan
Belfort, Nadine Belfort a/k/a Caridi,
JRB Group, Inc., RMS Network, Inc.,
and Maxwell Belfort, Defendants.**

**Bankruptcy No. 97–8074A (TLB).
Adversary No. 98–8459A.**

United States Bankruptcy Court,
S.D. New York.

May 7, 1999.

Weil, Gotshal & Manges, L.L.P., New York City, by Steven Alan Reiss, Curt P. Beck, Theodore E. Tsekerides, for Harvey R. Miller, as Trustee for Stratton Oakmont, Inc.

Ormsten & Evangelist, Jericho, New York, by Franklin D. Ormsten, for defendant Maxwell Belfort.

Andrews & Kurth, L.L.P., New York City, by Lynne M. Fischman Uniman, Jennifer L. Sulzberger, Paul N. Silverstein, Laurence E. Wiseman, for defendant Nancy Porush.

Murray & McCann, Rockville Centre, New York, by Joseph D. McCann, William J. Kelleher III, for defendant Nadine Belfort.

Phillips, Lytle, Hitchcock, Blaine & Huber, L.L.P., New York City, by Leon C. Marcus, William M. Rossi–Hawkins, Michael J. DiLeo, for Daniel M. Porush.

Bodian & Eames, L.L.P., New York City, by Robert I. Bodian, Burton S. Weston, Great Neck, New York, by Burton S. Weston, for Jordan Belfort and JRB Group, Inc.

## OPINION ON MOTION TO DISMISS

TINA L. BROZMAN, Chief Judge.

The defendants in this adversary proceeding move to dismiss certain of the claims asserted against them for failure to plead fraud with particularity pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") 9(b) and failure to state a claim upon which relief can be granted pursuant to F.R.C.P. 12(b)(6), both made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 7009 and 7012, respectively. The facts are drawn, as they must be on a motion of this sort, from the allegations of the complaint.

## I. Background

On January 24, 1998, (the "commencement date") Stratton Oakmont, Inc. ("Stratton") filed a petition for reorganization pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Upon application of the Securities Investor Protection Corporation ("SIPC"), the District Court for the Southern District of New York stayed the Chapter 11 proceedings, appointed Harvey R. Miller, Esq. as the liquidation trustee (the "Trustee") pursuant to the Securities Investors Protection Act of 1970 ("SIPA") and removed the liquidation proceeding ("SIPA Proceeding") to this court. In accordance with the statutory mandate, this SIPA proceeding is being conducted, to the extent not inconsistent with SIPA, as a liquidation proceeding under Chapters 1, 3, 5 and Subchapters I and II of Chapter 7 of the Bankruptcy Code. See 15 U.S.C. § 78fff(b).

The Trustee commenced an adversary proceeding on May 13, 1998, against Daniel Porush and his wife, Nancy (collectively the "Porushes"); Jordan Belfort ("Belfort") and his wife, Nadine (collectively the "Belforts"); Belfort's father, Maxwell Belfort ("Maxwell"); JRB Group, Inc. ("JRB"), and RMS Network, Inc. ("RMS"). The gravamen of the Trustee's Complaint is a fraudulent scheme principally orchestrated by Belfort and Porush, with the help of their wives and Belfort's father, to strip Stratton and its creditors of whatever assets and income stream Stratton had to offer. Central to the Trustee's theory are: 1) the "Stock Purchase" and "Non–Compete" Agreements (the "SP" and "NCP Agreements," respectively) and the payments made to Belfort pursuant thereto (the "SP" and "NCP Payments"), and 2) the payment of excessive salaries and bo-

nuses to Porush (the "S & B Payments"), all of which either rendered Stratton insolvent or occurred while Stratton was already insolvent.

The Complaint contains thirteen claims for relief. The first four are premised on actual and constructive fraud pursuant to New York Debtor and Creditor Law ("DCL") §§ 270–281 and §§ 544(b) and 550(a) of the Bankruptcy Code.[1] The Fifth through Seventh Claims are for breach of fiduciary duty and are not the subject of these dismissal motions. The remaining five claims are grounded in common law or equity[2] or in § 720 of the New York Business Corporation Law ("BCL"), which allows recovery for breach of fiduciary duty. The Complaint seeks primarily to recover from the defendants the SP, NCP and S & B Payments as fraudulent transfers, and secondly, to recover damages for the losses incurred through the unlawful diversion of Stratton's assets.

### A. Stratton's Management

Stratton, a general securities broker-dealer with executive offices in Lake Success, New York, was wholly-owned by its parent and alleged alter ego, RMS. *See* Adversary Proceeding Complaint, at ¶¶ 30–32 (all citations to the Complaint are referred to as "¶ ___ "). RMS is a shell corporation with no other purpose than to own 100% of the shares of Stratton. ¶ 31. RMS and Stratton maintained the same office space, telephone lines, corporate records and documents, as well as the same officers, directors, and shareholders. ¶ 32.

Up until March 10, 1994, both Porush and Belfort were officers and directors of Stratton and RMS[3], (¶¶ 23, 25), holding the lion's share of the RMS stock. ¶ 31.

Stratton was grossly mismanaged by Belfort and Porush, (¶¶ 41–45), leading to its insolvency. ¶ 41. In March 1992, the Securities and Exchange Commission ("SEC") charged both of them, as principals of Stratton, with market manipulation and fraudulent acts and practices relating to the offer and sales of securities. ¶¶ 42–44. In 1993, Belfort and Porush decided to negotiate a Consent Order with the SEC ("SEC Consent Order"). ¶ 45. On August 13, 1993, Belfort resigned as President of Stratton and was immediately replaced by Porush. ¶ 46. Notwithstanding this resignation, Belfort continued to hold himself out and to receive compensation as an "officer" of Stratton. ¶ 51. He also remained a director of Stratton and, with Porush's help[4], authorized Stratton to pay himself large bonuses totaling over $1,400,-000 between late 1993 and early 1994, all of which are reflected in Stratton's books and records. ¶¶ 47–48. While Porush scratched Belfort's back, so the theory goes, Belfort scratched Porush's by co-authorizing over $600,000 in bonuses payable to Porush during the same time period. ¶ 50.

By February 1994, the terms of the SEC Consent Order had been hammered out; Belfort would be barred from the securities industry for life and Porush was to be suspended from serving in any su-

---

1. The First and Second Causes of Action implicate all the defendants whereas the Third and Fourth are only asserted against the Porushes. Belfort does not move to dismiss the First Claim for Relief for actual fraud.

2. These are for conversion, aiding and abetting a breach of fiduciary duty, civil conspiracy to commit a breach of fiduciary duty, the imposition of a constructive trust and an accounting.

3. At all relevant times to this complaint, Belfort was and remained the President of JRB. ¶ 33.

4. According to the Complaint, bonuses and salaries had to be authorized by Stratton's Board of Directors (the "Board"). ¶¶ 47,48. Often, Porush and Belfort signed a "Unanimous Consent of the Board of Directors to Corporate Action in lieu of Special Meeting of the Board of Directors" in order to carry out their scheme. ¶¶ 47–50. These unanimous consents enabled Porush and Belfort to co-authorize bonuses and other financial rewards to each other.

pervisory capacity at Stratton for one year. ¶¶ 52, 79. Aware of what the future held in store, on February 10, 1994, Belfort resigned as a director of Stratton. ¶ 53. Taking advantage of that vacant director's position, Porush elected himself President of Stratton for a second time, increasing his salary 100% from $720,000 to $1,560,000 per annum. ¶ 53. On March 17, 1994, Porush and Belfort agreed to the terms of the SEC Consent Order. ¶ 55.

## B. The Alleged Fraudulent Transfers

With the knowledge of the impending SEC Consent Order and its effect, Porush and Belfort directed the preparation of the SP and NCP Agreements, (¶ 56), whose simultaneous execution was also part of the plan to strip Stratton of its assets. ¶¶ 10, 11. Both agreements were to be funded by Stratton. ¶ 12. On March 10, 1994, only one week before the SEC Consent Order was to become effective, Porush and Belfort entered into the SP and NCP Agreements. ¶ 61. The former provided that Belfort would sell his 47.5% of the common stock of RMS to Porush for $1,200,000 (plus interest at 3.65%), which was to be paid in 36 equal monthly installments of $35,242.25 from March 15, 1994, to February 15, 1997. ¶ 57; see Exhibit A annexed to the Complaint. Porush then became the 95% shareholder of RMS. ¶ 31. The latter agreement was executed by Belfort, Porush and RMS and provided that RMS would pay Belfort and JRB (in the event of Belfort's death) $180,000,000 for 1) a covenant not to compete with RMS for fifteen years and 2) a promise to introduce certain investment banking business to RMS. ¶ 58; see Exhibit A annexed to the Complaint. Under this second agreement, payments of one million dollars were scheduled to be made to Belfort every month beginning on March 15, 1994, and ending on February 15, 2009. ¶ 58. The Trustee treats the SP and NCP Agreements as the foundation of the defendants' scheme to defraud and loot Stratton. Looking at everything accomplished by the simultaneous execution of and real parties in interest to both agreements, Porush gained complete control of Stratton by acquiring Belfort's 47.5% share of RMS (because RMS owned 100% of Stratton) in exchange for having Stratton pay Belfort $1,200,000 up front and $180,000,000 over time.

Although RMS is the obligee under the NCP Agreement, the Trustee pleads that RMS was but a conduit since Stratton was advancing the needed funds to RMS to pay Belfort. ¶¶ 12, 13, 58, 74 and 76. It is also the NCP Agreement which, the Trustee maintains, if Stratton was not already insolvent, rendered Stratton insolvent. ¶¶ 13, 39. Stratton's then corporate counsel advised Porush and Belfort that the agreements were defective and recommended that Stratton not enter into them. ¶ 59. Needless to say, in light of their execution, that advice was ignored. ¶ 60.

The Trustee alleges that these agreements were patently fraudulent and lacked consideration because they contained valuations of Stratton and RMS that were completely inconsistent and unrealistic. ¶¶ 63–64. The SP Agreement effectively valued RMS at $2,500,000, roughly twice what Porush paid Belfort for his 47.5% share in RMS. ¶ 64. Remembering that RMS owned 100% of the shares of Stratton and is allegedly the alter ego of Stratton, (¶ 31), a valuation of RMS is for all intents and purposes a valuation of Stratton. ¶ 64. The fraud alarm goes off, so the Trustee's theory runs, when the valuation of RMS/Stratton under the SP Agreement is juxtaposed against the $180 million RMS and Porush agreed to pay Belfort for him not to compete with Stratton while Belfort was already incapable of competing with RMS because he was barred from the industry for life. ¶¶ 12, 64. The Trustee maintains that Belfort, Porush and Maxwell knew that there was no consideration for the SP and NCP Agreements. ¶¶ 65–68.

The Trustee alleges that Porush, at that point in full control of Stratton, paid him-

self from February, 1994 until Stratton's demise in 1997, excessive salaries and bonuses while Stratton was insolvent. ¶¶ 78–84. For example, between March and October 1994, while Porush was barred from engaging in any supervisory activities at Stratton by the SEC, he paid himself $2,372,500 in cash "bonuses" and $4,889,825 in stock "bonuses," in addition to his annual salary of $1,560,000. ¶ 81. In 1995, Porush took the equivalent of $5,562,597 in stock "bonuses" from Stratton. ¶ 82. In October, 1995, Porush received a third 100% pay increase, further boosting his salary to $3,6000,000 a year. ¶ 83. Thus, in total, between 1994 and 1997, it is alleged, Porush pilfered approximately $18,156,228 disguised as salaries and bonuses. ¶ 86. The Trustee asserts that not only were the S & B Payments fraudulent conveyances but they also constituted a waste and conversion of Stratton's assets as well as a breach of Porush's fiduciary duty to Stratton because the S & B Payments were excessive and unreasonable and made while Stratton was insolvent. ¶ 85.

## C. Maxwell Belfort and Stratton's Financial Status

Maxwell was the Secretary and Treasurer of RMS and the alleged *de facto* Chief Financial Officer of Stratton from 1993 until the commencement date.[5] ¶¶ 27, 29, 32 and 74. In that position, he signed most, if not all, of Stratton's checks and authorized its wire transfers. ¶¶ 29, 32 and 74. He was aware of Belfort's and Porush's positions as officers and directors of Stratton, of Stratton's business and financial affairs and of the SEC Consent Order barring Belfort from the securities industry for life and Porush from any supervisory capacity for one year. ¶¶ 65–68. Acting pursuant to Porush's instructions (¶¶ 28, 29 and 74), the Trustee claims, Maxwell was instrumental in perpetrating Belfort's and Porush's fraudulent and self-dealing

scheme by upstreaming the necessary cash from Stratton to RMS as "management fees" in order to make the necessary payments to Belfort pursuant to the NCP Agreement and by creating corresponding fraudulent internal invoices representing the transfers from Stratton to RMS. ¶¶ 28, 74. Maxwell also facilitated the payment of the excessive salaries and bonuses to Porush because he had to release those monies to Porush. ¶ 27. In July 1995, when Stratton was no longer financially able to make the million dollar payments to Belfort, the amounts advanced to RMS by Stratton for that purpose were reduced to $500,000, ¶ 74. The Trustee alleges that an additional amount was upstreamed alongside the NCP Payments to pay Maxwell's excessive salary and bonuses. ¶ 74.

The Trustee alleges that Porush, Belfort and Maxwell knew that Stratton's 1993 financial statements and SEC filings were inflated as a result of a failure to report operating lease commitments of over $4,000,000, equipment leases, and litigation and arbitration liabilities. ¶ 67. These parties also knew that approximately $30 to $40 million in customer claims from 1994 and 1995 were being asserted against Stratton and that these liabilities were not featured or accounted for in Stratton's financial statements for those years, (¶ 67), in those amounts or in a percentage of those amounts which would have represented the figure Stratton had historically paid to resolve or satisfy such claims. ¶ 68. Thus, the Trustee pleads that Maxwell, his son and Porush breached their fiduciary duties to Stratton by entering into the SP and NCP Agreements and by paying themselves excessive bonuses and salaries, liabilities they knew Stratton was unable to satisfy unless it failed to satisfy others. ¶¶ 15, 64–68.

## D. Nancy Porush and Nadine Belfort

Last, but not least, the Trustee targets the wives of Belfort and Porush as alleged

5. Although not technically an officer of Stratton, Maxwell Belfort held himself out as an

employee of Stratton. ¶ 27.

recipients of the proceeds of their husbands' fraudulent scheme. Nancy is allegedly the settlor of an offshore Gibraltar trust used by Porush to secrete at least some of the Stratton property he illegally gained. ¶¶ 24, 69 and 87. When the trust was created, its *res* was approximately $1.5 million. ¶ 69. The tax returns allegedly used by the Porushes to create the trust reflected that Nancy had no income or property of her own sufficient to fund such a trust. ¶ 69. Nadine is also the alleged settlor of an unidentified trust. ¶ 70. The corpus was made up, at least in part, of proceeds from the SP and NCP Agreements paid to Belfort. ¶¶ 26, 70 and 77.

## II. Applicable Legal Standards

### A. F.R.C.P. 12(b)(6)

Dismissal for failure to state a claim under F.R.C.P. 12(b)(6) is appropriate only where it appears that a plaintiff can prove no set of facts upon which relief may be granted. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 51 (2d Cir.1995); *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127 (2d Cir. 1994). All well-pleaded factual allegations contained in the complaint are to be taken as true, *see Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Acito,* 47 F.3d at 51; *Shields,* 25 F.3d at 1127, and construed in a light most favorable to the plaintiff. *See LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991); *Eisenberg v. Feiner (In re Ahead By a Length, Inc.),* 100 B.R. 157, 162 (Bankr. S.D.N.Y.1989) (*citing Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683). However, courts are free to disregard legal conclusions, deductions or opinions couched as factual allegations. *See* 5A C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1357, at 311–18 (2d ed.1990); 2 Coquillette, MOORE'S FEDERAL PRACTICE 3D, § 12.34[1][b], at 12–61 10 12–62 (3d ed.1998).

In addition to the factual allegations in the complaint, the court may consider the contents of any documents attached to the complaint or incorporated therein by reference, matters as to which judicial notice may be taken, and documents either in the plaintiff's possession or of which the plaintiff had knowledge and relied upon in bringing suit. *See Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *Nisselson v. Drew Industries, Inc. (In re White Metal Rolling & Stamping Corp.),* 222 B.R. 417, 422 (Bankr.S.D.N.Y.1998); *Bonwit Teller, Inc. v. Jewelmasters, Inc. (In re Hooker Invs., Inc.),* 162 B.R. 426, 430 (Bankr.S.D.N.Y. 1993). The issue is not whether the Trustee ultimately will prevail on the merits but whether he is entitled to offer evidence to support his claims. *B. Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.),* 218 B.R. 689, 696 (Bankr.S.D.N.Y. 1998) (*citing Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683); *Shearson Lehman Hutton, Inc. v. Schulman (In re Schulman),* 196 B.R. 688, 699 (Bankr.S.D.N.Y.1996).

### B. F.R.C.P. 9(b)

All of the defendants have moved to dismiss the Complaint for failure to plead fraud with the particularity required by F.R.C.P. 9(b), which seeks to provide a defendant with sufficient and fair notice of the plaintiff's claim in order to enable that defendant to defend him or herself, protect a defendant's reputation from the harm that can flow from unfounded accusations of fraud, and reduce the number of strike suits. *See Campaniello Imports, Ltd. v. Saporiti Italia,* 117 F.3d 655, 663 (2d Cir. 1997); *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir. 1991). To satisfy F.R.C.P. 9(b)'s pleading requirements, the complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Acito,* 47 F.3d at 51 (*citing Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)); *Shields,* 25 F.3d at 1128.

Thus, F.R.C.P. 9(b) requires a plaintiff "to identify which defendant caused each allegedly fraudulent communication to be spoken, written, wired or mailed, and to whom; when the communication was made; and how it furthered the fraudulent scheme." *Renner v. Chase Manhattan Bank,* 1999 WL 47239, *4 (S.D.N.Y. Feb. 3, 1999) (*citing McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir.1992)).

"Malice, intent, knowledge and other condition of mind of a person may be averred generally." F.R.C.P. 9(b). However, the relaxation of the specificity requirement for scienter is not to be abused or "mistaken for license to base claims of fraud on speculation and conclusory allegations." *Shields,* 25 F.3d at 1128 (*citing O'Brien,* 936 F.2d at 676); *Acito,* 47 F.3d at 52. Accordingly, a plaintiff must allege facts that give rise to a strong inference of fraudulent intent. *See Acito,* 47 F.3d at 52; *Shields,* 25 F.3d at 1128. In order to establish the requisite "strong inference" of fraud, the Second Circuit has stated that a plaintiff must either (a) allege facts showing that defendants had both motive and opportunity to commit fraud, or (b) allege facts which constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Acito,* 47 F.3d at 52; *Shields,* 25 F.3d at 1128; *White Metal Rolling,* 222 B.R. at 428.

 There are several other important principles to consider in reviewing this Complaint. The first is that where a case involves multiple defendants, F.R.C.P. 9(b) requires that the complaint allege facts specifying each defendant's contribution to the fraud, identifying which defendant is responsible for which act. *See Ellison v. American Image Motor Co., Inc.,* 36 F.Supp.2d 628, 640–41 (S.D.N.Y.1999); *Daly v. Castro Llanes,* 30 F.Supp.2d 407, 414 (S.D.N.Y.1998) (*citing DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987)).

Generally, fraud allegations cannot be based upon information and belief.

*See DiVittorio,* 822 F.2d at 1247. There is a recognized exception to this general rule, however, where the facts are in the control of the opposing party or within the opposing party's knowledge, as long as these allegations are accompanied by a statement of the facts upon which the belief is based. *Id.; see Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990) ("Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard."); *Sunrise Industrial Joint Venture v. Ditric Optics, Inc.,* 873 F.Supp. 765, 772 (E.D.N.Y.1995) ("Indeed, the particularity requirement of Rule 9(b) is appropriately relaxed where the individual defendant is a corporate insider."); *White Metal Rolling,* 222 B.R. at 428. Greater liberality in the pleading of fraud is particularly appropriate in bankruptcy cases, because, as here, it is often the trustee, a third party outsider to the fraudulent transaction, that must plead the fraud on secondhand knowledge for the benefit of the estate and all of its creditors. *See White Metal Rolling,* 222 B.R. at 428 ("Since a bankruptcy trustee rarely has personal knowledge of the events preceding his appointment, he can plead fraud based upon information and belief provided he pleads the basis of his belief."); *Atlanta Shipping Corp., Inc. v. Chemical Bank,* 631 F.Supp. 335, 348 (S.D.N.Y. 1986), *aff'd* 818 F.2d 240 (2d Cir.1987); *Hassett v. Zimmerman (In re O.P.M. Leasing Services, Inc.),* 32 B.R. 199, 203 (Bankr.S.D.N.Y.1983) (*citing Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374. 379 (2d Cir.1974)); *Ahead By A Length,* 100 B.R. at 166. When the trustee's lack of personal knowledge is compounded with complicated issues and transactions which extend over lengthy periods of time, the trustee's handicap increases and courts, therefore, should afford him or her even greater latitude. *See A.I.A. Holdings, S.A. v. Lehman Brothers, Inc.,* 1998 WL 159059, *6 (S.D.N.Y. April 1, 1998) (*citing In re Olympia Brewing Co. Secs. Litig.,*

674 F.Supp. 597, 620 (D.Ill.1987)). But as with the less strict scienter pleading standard, relaxing the particularity requirement in bankruptcy cases should not be construed to eliminate that requirement altogether. *See Devaney v. Chester,* 813 F.2d 566, 569 (2d Cir.1987).

▮ Lastly, F.R.C.P. 9(b) must be read together with F.R.C.P. 8(a), which calls for "short and plain statement[s]" of claims for relief. *DiVittorio,* 822 F.2d at 1247. With that in mind, whereas non-fraud causes of action need only be pleaded in accordance with F.R.C.P. 8(a), to the extent any of those claims is premised on fraudulent conduct, the facts alleging that conduct are subjected to the higher pleading standard of F.R.C.P. 9(b). *See Daly,* 30 F.Supp.2d at 414 (holding that F.R.C.P. 9(b) applies not only to fraud claims but also to elements of other claims that are premised on fraud, such as conversion and unjust enrichment); *A.I.A. Holdings,* 1998 WL 159059 at \*8 (*citing ABF Capital Mgt. v. Askin Capital Mgt., L.P.,* 957 F.Supp. 1308, 1328 (S.D.N.Y.1997)) (breach of fiduciary duty claims and aiding and abetting fraud claims are subject to the particularity requirements of F.R.C.P. 9(b) because the claims rely primarily upon allegations of fraudulent conduct). Additionally, where the complaint incorporates by reference prior allegations of fraud into other claims traditionally not perceived to be grounded in fraud, those claims must then be pleaded according to F.R.C.P. 9(b). *See Ellison,* 36 F.Supp.2d at 638–39 (holding that to the extent preceding allegations in the complaint, which unambiguously sound in fraud, are incorporated by reference into the § 12(a)(1) claim, that claim must be pleaded with particularity); *ICD Holdings, S.A. v. Frankel,* 976 F.Supp. 234, 246 (S.D.N.Y.1997) (incorporating other allegations of fraud makes F.R.C.P. 9(b) applicable).

### III. The First Through Fourth Claims for Relief: Avoiding Fraudulent Transfers

The First and Second Claims asserted against all the defendants have their genesis in the SP and NCP Agreements while the Third and Fourth Claims against the Porushes spring only from the S & B Payments. The crux of the defendants' dismissal motions is the Trustee's asserted (1) inability to establish the existence of some type of "transferee" under § 550(a) of the Bankruptcy Code, without which he cannot recover any fraudulent conveyances under § 544, 2) failure to state a claim for actual or constructive fraud and/or 3) failure to plead fraud with particularity pursuant to F.R.C.P. 9(b).

▮ These first four claims seek the avoidance of the SP, NCP and S & B Payments pursuant to § 544(b) of the Bankruptcy Code, the principal purpose of which is to undo pre-petition transfers of property that remove or withhhold that property from the estate to the prejudice of creditors. *Pereira v. Goldberger (In re Stephen Douglas, Ltd.),* 174 B.R. 16, 19 (Bankr.E.D.N.Y.1994); *see* 5 L. King, COL-LIER ON BANKRUPTCY, ¶ 544.09[2] at 544–18 to 18.1 (15th ed. Rev.1998). Section 544(b) provides in pertinent part that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an [allowed] unsecured claim." 11 U.S.C. § 544(b). Section 544, however, contains no original substantive provisions to determine when a prepetition transfer is voidable; instead it incorporates and makes applicable non-bankruptcy law, which in the present case is the DCL.[6] *Hirsch v. Gersten (In re Centennial Textiles, Inc.),* 220 B.R. 165, 171 (Bankr. S.D.N.Y.1998) (*citing Stephen Douglas,* 174 B.R. at 19–20). No one disputes that there is at least one actual unsecured creditor who could set aside a fraudulent trans-

---

**6.** New York's DCL Article 10 enacts the Uniform Fraudulent Conveyance Act rather than the more modern Uniform Fraudulent Transfer Act.

fer under the DCL, so that the trustee may step into the shoes of such creditor and void the entire transfer. *See O.P.M. Leasing Services*, 32 B.R. at 201 (*citing In re Tabala*, 11 B.R. 405, 406 (Bankr. S.D.N.Y.1981)); *see also Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931) (the right of the trustee to recover is dependent upon just one creditor with a cause of action and not dependent at all upon the size of that creditor's claim against the debtor).

Once the grounds for setting aside a transfer have been shown, the Trustee faces the second hurdle of establishing a means of recovery under § 550(a)[7], the remedies section, which requires the Trustee to identify a specific category of persons from whom recovery of the fraudulent transfer may be had. 11 U.S.C. § 550(a); *see Cassirer v. Sterling National Bank & Trust (In re Schick)*, 223 B.R. 661, 664 (Bankr.S.D.N.Y.1998). However, recovery for the estate under § 550(a) is available only to the extent a transfer has been successfully avoided pursuant to any of the avoidance sections of the Bankruptcy Code, including § 544(b). *See Bowers v. Atlanta Motor Speedway Inc. (In re Southeast Hotel Properties Limited Partnership)*, 99 F.3d 151, 154 (4th Cir.1996); *Centennial Textiles*, 220 B.R. at 171.

### A. Identifying the Transferee or Beneficiary under § 550(a)

There are three types of entities from whom or which a trustee may recover an avoidable transfer under § 544(b): an initial transferee, an entity for whose benefit the initial transfer was made or a subse-

quent transferee. *See* 11 U.S.C. § 550(a); *Christy v. Alexander & Alexander (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 56 (2d Cir.1997); *Southeast Hotel*, 99 F.3d at 154. The statute clearly separates "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made" from "(2) any immediate or mediate transferee of such initial transferee," otherwise known as the subsequent transferee, *see* 11 U.S.C. §§ 550(a)(1) & (2); *Finley, Kumble*, 130 F.3d at 57; *Danning v. Miller (In re Bullion Reserve of North America)*, 922 F.2d 544, 547 (9th Cir.1991); *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 895 (7th Cir.1988), because the liability to the estate of the initial transferee or the entity for whose benefit the initial transfer was made is absolute, *see Finley, Kumble*, 130 F.3d at 57; *Southeast Hotel*, 99 F.3d at 154; *Bullion*, 922 F.2d at 547, whereas the liability of the subsequent transferee to the estate is not strict but subject to the "good faith purchaser for value" defense contained in § 550(b). *See* 11 U.S.C. § 550(b); *Southeast Hotel*, 99 F.3d at 154; *Bullion*, 922 F.2d at 548.

The Bankruptcy Code does not define the word "transferee" nor does it define the type of "benefit" that must inure to an entity in order for it to be strictly liable to the estate. Questions have arisen where the first recipient of the transfer is not the intended beneficiary but, rather, someone like a courier or bank teller. *See Finley, Kumble*, 130 F.3d at 56; *Bonded*, 838 F.2d at 893–894. Every Circuit that has encountered the "initial transferee"[8] question has adopted the "dominion and con-

---

**7.** Section 550(a) provides in relevant part that
(a) Except as otherwise provided in this section, to the extent a transfer is avoided under section 544 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property, from—
(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.
11 U.S.C. § 550(a).

**8.** Although most cases discuss "transferee" in terms of the initial transferee, it is clear from *Bonded* that the judicial definition was meant to apply across the board, to immediate and mediate transferees as well. *See Bonded*, 838 F.2d at 896.

trol" test set forth by the Seventh Circuit in *Bonded Financial Services, Inc. v. European American Bank,* 838 F.2d 890 (7th Cir.1988), where Judge Easterbrook held:

> [W]e think the minimum requirement of status as a "transferee" is dominion over the money or other asset, the right to put the money to one's own purposes. When A gives a check to B as agent for C, then C is the "initial transferee"; the agent may be disregarded.... "Transferee" is not a self-defining term; it must mean something different from "possessor" or "holder" or "agent".

*Bonded,* 838 F.2d at 893; *see Finley, Kumble,* 130 F.3d at 57–58 (2nd Cir.1997); *Southeast Hotel,* 99 F.3d at 154–155 (4th Cir.1996); *Malloy v. Citizens Bank (In re First Security Mortgage Co.),* 33 F.3d 42, 44 (10th Cir.1994); *Security First Nat'l Bank v. Brunson (In re Coutee),* 984 F.2d 138, 140–141 (5th Cir.1993); *Bullion,* 922 F.2d at 548–549; *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.),* 848 F.2d 1196, 1199–1200 (11th Cir.1988).

▮▮▮ Thus, an initial transferee is the person who has dominion and control over the subject of the initial transfer to the extent that he or she may dispose of it as he or she pleases, such as "invest[ing] the whole [amount] in lottery tickets or uranium stocks." *Finley Kumble,* 130 F.3d at 57 (*citing Bonded,* 838 F.2d at 894); *Bullion,* 922 F.2d at 549; *Hooker Atlanta (7) Corporation v. Hocker (In re Hooker Investments, Inc.),* 155 B.R. 332, 338 (Bankr.S.D.N.Y.1993) (an initial transferee is one who can legally use the money for his own purposes). On the other hand, the person whose hands touch the money or property simply to forward it to the initial transferee is but a mere conduit or intermediary if he or she does not receive any benefit from the initial transfer. *See Finley, Kumble,* 130 F.3d at 57; *Southeast*

*Hotel,* 99 F.3d at 155; *Bonded,* 838 F.2d at 893; *Hooker,* 155 B.R. at 337 (conduits merely facilitate the transfer of funds or property). Courts have explained that it would be inequitable to impose the strict liability reserved for an initial transferee on a conduit simply because he or she was the first to physically hold the money or property despite the fact that he or she was powerless to "put the money to [his or her] own purposes." *Finley, Kumble,* 130 F.3d at 57 (discussing the unintended consequences that would ensue were courts to equate initial transferees with conduits); *see Bullion,* 922 F.2d at 549; *Chase & Sanborn,* 848 F.2d at 1199. Because an initial transferee [9] has dominion and control over the *res* of the initial transfer, whereas a conduit has but a fleeting possessory interest therein, initial transferees can never be conduits and *vice versa* respecting a single transfer. *See Finley, Kumble,* 130 F.3d at 57; *Southeast Hotel,* 99 F.3d at 155; *Lowry v. Security Pacific Business Credit, Inc. (In re Columbia Data Products, Inc.),* 892 F.2d 26, 28 (4th Cir.1989); *Hooker,* 155 B.R. at 337.

▮▮▮ Section 550(a) treats with transferees, those with the power and intent to manipulate the subject matter of the transfer on the one hand, as just discussed, and those who benefit from the initial transfer, on the other hand. *See Bonded,* 838 F.2d at 896. Logically, to benefit from the initial transfer cannot mean to exercise dominion and control over the money or property, or else the Bankruptcy Code would not have made a distinction between a transferee and the beneficiary of the initial transfer. Benefit occurs without the beneficiary ever holding the money or property, precisely because someone else received it. *See Finley, Kumble,* 130 F.3d at 57; *Southeast Hotel,* 99 F.3d at 155;

---

**9.** The *Bonded* interpretation of "transferee" applies not only to initial transferees but to subsequent transferees as well. *See Bonded,* 838 F.2d at 896. To qualify as a subsequent transferee, one must have dominion and control over the funds or property one receives.

Ultimately, an initial and subsequent transferee's relationship to the funds or property is the same; it is their relation in time to the initial transfer and their responsibility to the estate that differs.

*Bullion,* 922 F.2d at 547–548; *Bonded,* 838 F.2d at 895 (someone who receives the benefit but not the money). The key to pegging the entity for whose benefit the initial transfer was made has two sides: 1) the entity must be the intended beneficiary and 2) the intended benefit must originate from the initial transfer. *See Bullion,* 922 F.2d at 547 (court holding that the transfer must have been for the entity's benefit and that such benefit be a result of the initial transfer from the debtor and not some subsequent transfer); *Bonded,* 838 F.2d at 896 (only the person who receives a benefit from the initial transfer is within the statutory language).

▬▬▬ The quintessential example of the entity who benefits from the initial transfer is a guarantor of the debtor. *See Finley, Kumble,* 130 F.3d at 57; *Southeast Hotel,* 99 F.3d at 155; *Bonded,* 838 F.2d at 895. He or she is relieved of the obligation to pay the lender—which is the benefit—while the lender receives the money. As a general rule, initial transferees and entities for whose benefit the initial transfer was made are mutually exclusive. *See Southeast Hotel,* 99 F.3d at 155; *Bonded,* 838 F.2d at 895. The entity for whose benefit the initial transfer was made is also distinguished from a subsequent transferee (§ 550(a)(2)) because the former must be the intended beneficiary of the initial transfer and not someone who either benefits from the subsequent transfer of the initially transferred money or property, or benefits by happenstance from the initial transfer. *See Southeast Hotel,* 99 F.3d at 155; *Bullion,* 922 F.2d at 548 (a subsequent transferee cannot be an entity for whose benefit the initial transfer was made, even if the subsequent transferee actually receives a benefit from the initial transfer); *Bonded,* 838 F.2d at 895–96 (a subsequent transferee cannot be the entity for whose benefit the initial transfer was made).

### 1. Maxwell Belfort

▬▬▬ Although Maxwell[10] does not premise his request for dismissal on the Trustee's failure to state a claim under § 550(a) but, rather, on the grounds that neither the First nor the Second Claims plead fraud with particularity as required by F.R.C.P. 9(b)[11], the Trustee has not alleged any facts which would permit a recovery pursuant to § 550(a) from Maxwell. Nowhere has the Trustee alleged that Maxwell received any of or benefitted from the SP or NCP Payments. All the Trustee alleges is that as Maxwell moved the funds from Stratton to RMS and then to his son, "[a]n additional amount was upstreamed to pay Maxwell's excessive salary and bonuses."[12] ¶ 74. It is not alleged

---

10. I am using Maxwell Belfort's first name in order to distinguish him from his son. I am also doing the same with respect to Porush and Belfort's wives. In all instances, I do not mean to belittle or denigrate, only to differentiate.

11. The Trustee has pleaded that Maxwell knew that his son was banned from participating in the securities industry for the rest of his life; that he participated in paying his son in accordance with the NCP Agreement despite the fact that Belfort was legally prohibited from competing with Stratton; that Maxwell was the *de facto* chief financial officer of Stratton; that he knew Stratton's financial statements misrepresented the company's liabilities; and that he nevertheless kept paying Belfort, Porush and himself huge sums of money in satisfaction of fictitious obligations or undeserved bonuses. The Trustee is not in

a position to know all of the facts, such as the nature of Maxwell's exact role in the execution of Porush' and Belfort's scheme. However, the Trustee has given Maxwell notice of the basis of his claim of actual fraud against him. The Trustee has alleged a time period, with whom Maxwell communicated about the NCP payments (*i.e.* Porush), how he accomplished the fraudulent transfers (*i.e.* false billing statements) and that such conduct was reckless given the decrepit financial state in which Stratton found itself and of which Maxwell was aware. Therefore, were I faced with deciding whether the actual fraud claim against Maxwell was pleaded with particularity, I would hold that it was and would deny its dismissal.

12. Instead, these payments are more germane to the Trustee's claim for breach of fiduciary duty against Belfort.

that Maxwell was "paid off" with additional salary or bonuses for effecting the movement of funds from Stratton to RMS. The Complaint goes on to describe the false billing invoices that were used to cover up the million dollar advances from Stratton to RMS without ever stating how much money Maxwell took for himself, how or when. Even if the Trustee had given specific examples of payments to Maxwell, those monies would clearly not have been part of the SP and NCP Payments which the Trustee seeks to recover by way of the First and Second Claims for Relief. There are no allegations that Maxwell skimmed any of the NCP Payments intended for his son or that his son turned around and gave his father a cut of them. Maxwell took money from Stratton, placed it into RMS' bank account, then removed funds from RMS' account, and sent the payments to Belfort. As the Complaint stands, he was a mere conduit. Moreover, the Trustee does not indicate what benefit Maxwell was intended to receive from the SP and NCP· Payments to his son nor, even if he did receive a benefit, that he was the intended beneficiary of the SP and NCP Agreements. Accordingly, since the Trustee has failed to state a claim for recovery of the SP and NCP Payments from Maxwell under § 550(a), the First and Second Causes of Action against him should be dismissed. These pleading failures could possibly be redressed by the Trustee so he will be granted leave to replead.

### B. Actual Fraud

Claims of actual fraud fall under DCL § 276 [13], where the scienter requirement is "actual intent to hinder, delay, or defraud" present or future creditors. DCL § 276 (McKinney 1998). As discussed earlier, factual allegations supporting claims of intentional fraudulent transfer are scrutinized pursuant to F.R.C.P. 9(b), *see White*

*Metal Rolling*, 222 B.R. at 428 (*citing Atlanta Shipping Corp. v. Chemical Bank*, 818 F.2d 240, 251 (2d Cir.1987)), while taking into account that the Trustee is entitled to some leeway in the areas of scienter and particularity because he has no personal knowledge of the facts.

"Actual intent" is rarely susceptible to direct evidence and therefore may be gleaned from the circumstances surrounding the alleged fraudulent transaction. *See U.S. v. McCombs*, 30 F.3d 310, 328 (2d Cir.1994) (*citing In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1041 (2d Cir.1984)) (The court held that under § 276, the "fraudulent nature of a conveyance may be inferred from the relationship among the parties to the transaction and the secrecy of the sale, or from inadequacy of consideration and hasty, unusual transactions."); *Hassett v. Goetzmann*, 10 F.Supp.2d 181, 188 (N.D.N.Y.1998); *Breeden v. L.I. Bridge Fund, L.L.C. (In re The Bennett Funding Group, Inc.)*, 220 B.R. 739, 742 (Bankr.N.D.N.Y.1997). The Second Circuit has adopted certain "badges of fraud" or presumptions as circumstantial evidence of actual intent. *See Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir.1983); *Hassett*, 10 F.Supp.2d at 188; *Bennett Funding*, 220 B.R. at 755. These may include:

(1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors;

**13.** DCL § 276: Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or

future creditors, is fraudulent as to both present and future creditors. DCL § 276 (McKinneys 1998).

and (6) the general chronology of the events and transactions under inquiry. *Kaiser*, 722 F.2d at 1582. Other relevant recognized indicia of fraud are: 1) a transfer for no consideration when the transferor and the transferee know of the claims of creditors and know that creditors cannot be paid and 2) the existence of an unconscionable discrepancy between the value of the property transferred and the consideration received therefor. *Bennett Funding*, 220 B.R. at 755 (*citing* COLLIER, ¶ 548.04[2][b] at 548–24).

### 1. Porush

Porush faces two claims of actual fraud: the first based on the SP and NCP Payments and the second, on the S & B Payments.

■ The Trustee alleges that the SP and NCP Agreements were executed as part of Porush's and Belfort's scheme to defraud Stratton and its creditors.[14] He compares the value of RMS, the alleged alter ego holding company ($2.5 million, or twice what Porush paid Belfort for his RMS stock, which stock was worth was Stratton was worth), to Stratton's obligation to pay Belfort $180,000,000 pursuant to the NCP Agreement. Moreover, the Trustee alleges, since Belfort was banned for life from participating in the securities industry, there was patently no consideration given by Belfort to RMS (read Stratton) for the NCP Agreement. Although the issue of consideration is not dispositive under DCL § 276, it can be used as circumstantial evidence of actual intent to defraud where, as here, not only is there alleged to be no consideration but there is a huge discrepancy in Stratton's value as reflected in the SP Agreement on the one hand and the NCP Agreement on the other hand. The Trustee also alleges a course of conduct between Porush and Belfort which creates a strong inference that Belfort and Porush were in cahoots to bleed Stratton dry of all its assets in complete and conscious disregard of Stratton's creditors.

With respect to the Third Claim, the Trustee alleges numerous instances where Porush awarded himself substantial salary increases and undeserved bonuses, showering himself with over $18 million dollars in bonuses, more than $6 million of which was awarded while Porush was suspended from performing any supervisory functions at Stratton or RMS pursuant to the SEC Consent Order. Moreover, the Trustee alleges that Porush did not perform any services that would support or justify the award of such excessive bonuses. The Trustee even details the procedural means by which the salary increases and bonuses were awarded. The Trustee has sufficiently pleaded with particularity a course of conduct that shows that Belfort and Porush were operating together to abuse Stratton financially.

■ If the allegations be proven, the S & B, SP and NCP Payments are funds that, by being diverted to Porush's and Belfort's pockets, delayed and hindered any recovery by Stratton's legitimate creditors. The Trustee alleges that Porush knew of Stratton's ailing financial condition and of the tens of millions of outstanding customer claims against the company that would not get satisfied if the SP and NCP Agreements were honored and the S & B Payments were made. Thus, allegations are plentiful which support an inference that Porush was engaged in conscious misbehavior, or at a minimum reckless behavior, to use all of Stratton's assets to fund RMS's completely illusory obligations to Belfort and to pay Porush excessive salaries and bonuses. While it is true that some allegations are more detailed than others, the Trustee is permitted to plead in such a fashion given his second-hand knowledge of facts which are

---

**14.** Remember, Belfort does not move to dismiss the First Claim for Relief for Actual Fraud.

predominantly if not exclusively in the control of Porush and the other defendants. Nonetheless, the Complaint plainly puts Porush on notice of the time, place and manner of the events which constitute his alleged intent to defraud Stratton and its creditors. Thus, Porush's motion to dismiss these claims based on a failure to state a claim or plead fraud with particularity is denied.

### a. Recovery under § 550(a)

Porush argues that the Trustee fails to allege that Porush was the transferee of any of the SP or NCP Payments and therefore fails to state a claim under § 550(a).[15] Porush additionally posits that since Stratton was a wholly-owned subsidiary of RMS and RMS was 95% owned by Porush, the Trustee cannot logically argue that these payments were made for the benefit of Porush because the NCP payments were basically coming out of his own pocket. I disagree.

 The Trustee suggests that the SP and NCP Agreements be regarded as one transaction. Courts will overlook the formal structure of a transaction where the knowledge and intent of the parties involved indicate that the transactions should be viewed together. *See Wieboldt Stores, Inc. v. Schottenstein (In re Wieboldt Stores, Inc.),* 94 B.R. 488, 502 (N.D.Ill.1988); *Crowthers McCall Pattern, Inc. v. Lewis (In re Crowthers McCall Pattern, Inc.),* 129 B.R. 992, 998 (S.D.N.Y. 1991) (the court viewed loans, stock purchases and repayments as part of one large transaction because it held that it is essential to view transactions from the perspective of their effect on creditors); *see also United States v. Tabor Realty Corp. (In re Tabor Realty Corp.),* 803 F.2d 1288, 1302 (3d Cir.1986) (affirming district court's decision to collapse several transactions into each other in order to determine whether they constituted a fraudulent conveyance). Here, the Agreements were prepared at the same time and executed on the same day. The Trustee alleges that Porush and Belfort entered into these Agreements in anticipation of the SEC Consent Order becoming effective in order to effectuate their fraudulent scheme. I do not believe their impact on Stratton's creditors can be fully assessed without viewing them in unison. As separate transactions, it is hard to comprehend why Porush would pay Belfort $180,000,000 when the latter could not legally compete with the former.[16] On the other hand, if preventing Belfort from competing with Stratton was worth so much, why would Belfort let himself be bought out by Porush for a mere $1.2 million? The justifications emerge when the Agreements are interpreted as one transaction. Together, the Agreements enabled Porush to gain full control of Stratton by acquiring a 95% ownership interest in RMS while paying Belfort a smaller sum up front with the obligation to pay the remainder over time in the form of the NCP Payments. If RMS, funded by Stratton, had to pay Belfort a huge amount up front, there would have been nothing left for Porush to draw in the way of increased salaries and bonuses. Thus, if the allegations be true, the Agreements bought Porush time, control and the ability to take increased sums as salaries and bonuses while also staving off a bankruptcy filing to the last minute. Much like a guarantor, Porush received benefits from the Agreements even though he received no property directly. *See Southeast Hotel,* 99 F.3d at 155 (an entity for whose benefit the transfer was made is essentially someone who receives a benefit but no money). At this juncture, all the Trustee needs to demonstrate is a possible legal theory such that he is allowed to go forward and put on evidence. Although this benefit theory is not explicitly stated in the Complaint, recovery under § 550(a) is not subject to a particularized pleading standard and I am allowed to consider theories that are not articulated, so long as

---

**15.** Porush does not challenge that he indeed received the S & B Payments.

**16.** There may have been some very minor areas in which Belfort was still able to participate in the industry.

there are facts alleged to support them. Since that is the case here, the First Claim against Porush stands.[17]

### 2. Nancy Porush and Nadine Belfort

Nancy and Nadine move to dismiss the actual fraud claim on the grounds that the allegations regarding the offshore trusts fail to state a claim, fail to plead fraud with particularity and fail to plead that they are transferees pursuant to § 550(a).

▆▆▆▆ A transfer may be avoided as fraudulent pursuant to DCL § 276 if the conveyance was made with actual intent to defraud, hinder or delay present or future creditors. DCL § 276. It is the intent of the transferor and not that of the transferee that is dispositive. *See HBE Leasing Corporation v. Frank,* 61 F.3d 1054, 1059 n. 5 (2d Cir.1995) (to prove actual fraud under § 276, a creditor must show intent to defraud on the part of the transferor); *Crowthers McCall,* 129 B.R. at 999; *Brody v. Pecoraro,* 250 N.Y. 56, 61–62, 164 N.E. 741 (1928) (Cardozo, J.); *Leone v. Sabbatino,* 235 A.D.2d 460, 652 N.Y.S.2d 628, 629 (1997). The intent of the transferee only becomes relevant as an affirmative defense if the defendant is not the initial transferee. *See Golden Budha Corporation v. Canadian Land Company of America,* 931 F.2d 196, 201 (2d Cir.1991); *United States v. Orozco–Prada,* 636 F.Supp. 1537, 1541 (S.D.N.Y.1986) ("Proof of actual fraudulent intent makes a *prima facie* case and shifts to the grantee the burden of establishing his good faith in the transfer."); *Leone,* 652 N.Y.S.2d at 629.

▆▆▆▆ I have already determined that the Trustee has properly pleaded his actual fraud claims with respect to the S & B Payments as well as the SP and NCP Payments. The Complaint adequately apprises Nancy and Nadine of which transactions are claimed to be fraudulent and why, when they took place, how they were executed and by whom. The Trustee then alleges that Nancy and Nadine were subsequent transferees of those fraudulent transfers. He certainly gives them notice of how they received the funds, from whom they received them and where those original funds or their proceeds are housed. The Trustee need not allege that Nancy or Nadine, as transferees, intended to defraud Stratton or that they participated in the fraud perpetrated by their husbands in order to avoid the fraudulent transfers as to them. *See Crowthers,* 129 B.R. at 999; *Wieboldt,* 94 B.R. at 507. Whether Nancy and Nadine took those monies in good faith and for value are issues to be raised by them as affirmative defenses to the Trustee's recovery, *see Orozco–Prada,* 636 F.Supp. at 1541; *Leone,* 652 N.Y.S.2d at 629; *Wieboldt,* 94 B.R. at 507, and need not be negated by the Trustee in the Complaint. *See Wieboldt,* 94 B.R. at 507. As a result, I hold that the actual fraud claims against Nancy and Nadine withstand their respective motions to dismiss.

### C. Constructive Fraud

▆▆▆ The Second and Fourth Claims for constructive fraud are governed by DCL §§ 273 through 275[18]. *See HBE Leasing Corp. v. Frank,* 48 F.3d 623, 633 (2d Cir.1995); *Orozco–Prada,* 636 F.Supp. at 1540–41; *Pereira v. Private Brands, Inc. (In re Harvard Knitwear, Inc.),* 193 B.R. 389, 392–393 (Bankr.E.D.N.Y.1996).

---

17. Porush does not argue that he is not a transferee of the S & B Payments.

18. The Trustee bases his constructive fraud claims (Second and Fourth Claims for Relief) on DCL §§ 272 through 275:

Section 272 Fair Consideration: Fair consideration is given for property, or obligation,

a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

Section 273 Conveyance by Insolvent: Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to credi-

The Trustee must establish that the transfer in question 1) was made for less than fair consideration, *see Atlanta Shipping*, 818 F.2d at 248, and while the transferor 2) was insolvent or was thereby rendered insolvent (§ 273), had unreasonably small capital to operate the business (§ 274), or intended or believed that he or she would incur debts beyond his or her ability to pay as they matured (§ 275). *See* DCL §§ 273–275; *White Metal Rolling*, 222 B.R. at 429; *Centennial Textiles*, 220 B.R. at 171 (both insolvency and a lack of fair consideration are prerequisites to a finding of constructive fraud under § 273); *Stephen Douglas*, 174 B.R. at 20 (same).

 The pleading of constructive fraud, as opposed to actual fraud, must only comply with F.R.C.P. 8(a) because scienter is not an element; the claim is based upon the financial condition of the transferor at the time of the transfer and the sufficiency of the consideration provided by the transferee. *See White Metal Rolling*, 222 B.R. at 428–29 (the complaint must give the defendants sufficient notice to prepare an answer, frame discovery and defend against the charges); *In re O.P.M. Leasing Services, Inc.*, 35 B.R. 854, 863 (Bankr.S.D.N.Y.1983) *rev'd on other grounds*, 48 B.R. 824 (S.D.N.Y.1985) (Rule 9(b)'s particularity requirements do not apply to pleading a constructive fraud claim); *Allegaert v. Perot*, 78 F.R.D. 427, 430–431 (S.D.N.Y.1978).

### 1. Second Claim for Relief

The Second Claim for Relief alleges constructive fraud against all the defendants based on the SP and NCP Agreements. Led by Belfort, the defendants challenge the constructive fraud claim because the SP and NCP Agreements [19] did not obligate Stratton, but RMS, to pay Belfort, as a result of which those payments could not have rendered Stratton insolvent. Even though Stratton admittedly upstreamed to RMS the money with which to make the NCP payments, Belfort claims that neither he nor JRB had any recourse against Stratton were RMS to default on its obligations. Thus, he says, Stratton was not implicated by the NCP Agreement and under § 273 of the DCL, the Trustee cannot assert a claim for constructive fraud against any of the defendants. To overcome this seeming problem, the Trustee proposes a reverse veil piercing theory or to collapse Stratton and RMS into one entity, to which the defendants take strong exception, urging that such a step is an extremely rare occurrence and not warranted under these facts. They claim that the Trustee has not alleged that RMS was created for an illicit or fraudulent purpose or that Stratton and RMS, but for superficially, share the same corporate formalities.

a. Does the Trustee adequately plead that RMS and Stratton should be collapsed into one entity?

i. Standing

 The Trustee alleges that Stratton and RMS are alter egos of each other

---

tors without regard to actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

Section 274 Conveyances by Persons in Business: Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

Section 275 Conveyances by a Person about to Incur Debts: Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

Most of the Trustee's allegations fall under §§ 273 and 275.

19. In this section, I will refer to both agreements as the Agreement since I have found that they should be viewed as a unitary transaction.

(¶ 30) and should be viewed as one entity so that RMS' legal obligation under the Agreement is deemed to be that of Stratton. While traditional veil piercing contemplates reaching a parent corporation through its subsidiary, the Trustee seeks to reach the subsidiary through its parent, or in other words, to collapse RMS, the parent, into Stratton, the subsidiary.[20] Before I consider whether the Trustee has properly pleaded his reverse veil piercing theory, I must first address whether he has standing to assert it. In that vein, the defendants assert that he does not and make the following argument: "Stratton, in the form of the Trustee, now wants it both ways. Having benefitted from a transaction it structured to protect itself from creditor claims, it now seeks to collapse the structure, or to use the idiom, to pierce its own corporate veil ... in order to recapture each monthly payment made by RMS to Belfort." Belfort Brief in Support of Motion to Dismiss, page 18. I can make short shrift of this argument because the Trustee does not seek to pierce the corporate veil of RMS to reach Stratton for the benefit of Stratton or its shareholders, but, rather, for the benefit of the debtor's unsecured creditors.

█ A trustee's standing to pierce the corporate veil typically becomes an issue where he or she is seeking that relief in order to foist the liabilities of the corporate debtor to its creditor body onto its principals or its parent. In that situation, a trustee has standing if the underlying claim is a general one such that it could have been brought by any creditor of the debtor, and the debtor, under state law, could have asserted an alter ego claim to pierce its own corporate veil. *See Murray v. Miner,* 876 F.Supp. 512, 516 (S.D.N.Y. 1995) (*citing Kalb, Voorhis & Co. v. American Financial Corp.,* 8 F.3d 130, 132 (2d Cir.1993) and *St. Paul Fire & Marine Insurance Co. v. PepsiCo, Inc.,* 884 F.2d 688, 701 (2d Cir.1989)). Here, the Trustee is not seeking a declaration that one entity is liable for the debts of another. Instead, he is asserting avoidance claims to recover for the benefit of the estate which parted with the property, property allegedly fraudulently transferred to insiders. These avoidance claims are property of the debtor's estate under § 544(b) of the Bankruptcy Code, which permits a trustee to recover for an estate a transfer avoidable under state law by a creditor holding an allowable unsecured claim. *See, e.g., Kalb, Voorhis,* 8 F.3d at 132 (trustee is proper party to assert claim that is property of the estate); *cf. Solow v. Stone,* 994 F.Supp. 173, 178 (S.D.N.Y.1998) (same but not in the context of a fraudulent transfer); *Keene Corporation v. Coleman (In re Keene Corporation),* 164 B.R. 844, 851 (Bankr.S.D.N.Y.1994) (*citing St. Paul Fire & Marine,* 884 F.2d at 700)) ("The Bank-

---

**20.** In order to avoid any confusion, I believe that it would be useful to sort out the corporate veil "lingo." Traditionally, a court applies an "alter ego" theory where an individual abuses the corporate form to attain his or her own personal ends in order to hold that individual responsible for the liabilities of the corporation. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131, 138 (2d Cir.1991) ("The critical question is whether the corporation is a shell being used by the individual shareowners to advance their own purely personal rather than corporate ends."). Veil piercing is the term used most often with respect to the subsidiary*parent paradigm where a court seeks to impose the liabilities of the subsidiary on the parent because the latter completely dominates the former and has used that con-trol for an improper purpose. *See id.;* 1 FLETCHER CYC. CORP. § 43, p. 729 (Perm. ed.1990). The Second Circuit has held that the corporate veil piercing and alter ego tests are virtually the same. *See Passalacqua,* 933 F.2d at 138; *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.,* 909 F.2d 698, 703 (2d Cir.1990) ("New York law allows the corporate veil to be pierced either when there is fraud or when the corporation has been used as an alter ego."); *accord* 1 FLETCHER, § 41.10 at 616. In addition, a corporation may also be held to be the alter ego of another corporation and not only of shareholder or principal of that corporation. *See* 1 FLETCHER, § 41.10 at 616. In such situations, the corporations are treated as one or, to use the Trustee's words, "collapsed" into one. *See id.*

ruptcy Code permits the trustee to assert claims which . . . under his 'strong arm' or avoiding powers [ ] belong to the debtor's creditors under state law."); *Gosconcert v. Hillyer,* 158 B.R. 24, 28 (S.D.N.Y.1993).

State law governs the application of corporate veil piercing principles in the context of transfer avoidance actions in bankruptcy. *Barber v. Production Credit Services (In re KZK Livestock, Inc.),* 221 B.R. 471, 478 (Bankr.C.D.Ill.1998); *see Keene,* 164 B.R. at 851 (*citing St. Paul Fire & Marine,* 884 F.2d at 700); 3A FLETCHER CYC. CORP., § 1277.10, p. 600–01 (Perm. ed.1994). Thus, if an unsecured creditor is allowed under New York law to sue a subsidiary on account of its parent's obligation, then so is the Trustee authorized pursuant to § 544(b) to sue Stratton on behalf of the estate. The cases under New York law affirm this proposition. *See Gosconcert,* 158 B.R. at 28 (*citing Green v. Bate Record, Inc. (In re 10th Ave. Records Distributors, Inc.),* 97 B.R. 163, 165–66 (S.D.N.Y.1989) ("Under New York law, a trustee may bring an alter ego cause of action on behalf of a corporate debtor in an attempt to collect property of the estate for the benefit of all creditors if such an action is not personal to any particular creditor.")); *Keene,* 164 B.R. at 852. It must be remembered that piercing the corporate veil, be it backwards or forwards, is not, in and of itself, an independent cause of action but a procedural device through which a plaintiff may assert facts and circumstances to persuade the court to impose the parent corporation's obligation on the subsidiary or *vice versa. See State v. Easton,* 169 Misc.2d 282, 647 N.Y.S.2d 904, 908 (1995) (*citing Morris v. Dep't of Taxation and Finance,* 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 623 N.E.2d 1157 (1993)); *see also Spartan Tube and Steel, Inc. v. Himmelspach (RCS Engineered Products*

*Company, Inc.),* 102 F.3d 223, 226 (6th Cir.1996). In this instance, the underlying actions to which this reverse veil piercing theory attaches are all the Trustee's constructive fraudulent conveyance claims.

New York law recognizes reverse veil piercing. *See American Fuel Corporation v. Utah Energy Development Company,* 122 F.3d 130, 134 (2d Cir.1997) (*citing Easton,* 647 N.Y.S.2d at 908–09). Typically, reverse veil piercing arises when a plaintiff seeks to hold a corporate entity accountable for the actions of its shareholders, *see American Fuel,* 122 F.3d at 134; *LiButti v. United States,* 107 F.3d 110, 119 (2d Cir.1997) (holding that reverse piercing occurs when the assets of the corporate entity are used to satisfy the debts of the controlling alter ego); *Easton,* 647 N.Y.S.2d at 909, or, similarly, to hold a subsidiary liable for the debts of its parent.[21] *See In re Thomson McKinnon Securities, Inc.,* 149 B.R. 61, 73 (Bankr. S.D.N.Y.1992) (*citing Mid–West Products, Inc. v. Simpson (In re Mid–West Products, Inc.),* 13 B.R. 562 (Bankr.D.Kan. 1981)). Courts that pierce the corporate veil in reverse are guided by the rules that govern straight veil piercing. *See e.g. American Fuel,* 122 F.3d at 134; *Easton,* 647 N.Y.S.2d at 909 ("conceptually 'reverse' piercing is not inconsistent with nor antithetical to the salutary purposes of traditional piercing"). So, we turn to those principles.

ii. Traditional Corporate Veil Piercing

"The concept of piercing the corporate veil is a limitation on the accepted principles that a corporation exists independently of its owners, as a separate legal entity, that the owners are normally not liable for the debts of the corporation, and that it is perfectly legal to incorporate

---

**21.** While most cases discuss reverse veil piercing in the context of holding a corporation liable for the debts of its principal or shareholders (i.e., the reverse "alter ego" scenario), *Thomson McKinnon,* a case from this District, stated in *dictum* that a subsidiary

could be responsible for the obligations of its parent. *See In re Thomson McKinnon Securities, Inc.,* 149 B.R. 61, 73 (Bankr.S.D.N.Y. 1992) (*citing Mid–West Metal,* 13 B.R. at 566); *see also* 1 FLETCHER, § 43.60 at 781.

for the express purpose of limiting the liability of the corporate owners." *Morris*, 82 N.Y.2d at 140, 603 N.Y.S.2d 807, 623 N.E.2d 1157. Traditionally, a third party seeks to pierce the corporate veil in order to circumvent this protective structure and hold the parent corporation accountable for the liabilities of its subsidiary. *See id.* at 140–41, 603 N.Y.S.2d 807, 623 N.E.2d 1157. Piercing the corporate veil is an equitable doctrine for it is a means to achieve the end of preventing fraud and the abuse of corporate separateness. *See Morris*, 82 N.Y.2d at 140, 603 N.Y.S.2d 807, 623 N.E.2d 1157; *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 138 (2d Cir. 1991); *David v. Glemby Company, Inc.*, 717 F.Supp. 162, 166 (S.D.N.Y.1989). As is always the case with equity, decisions to pierce the corporate veil should be made according to the circumstances of each particular case. *See Morris*, 82 N.Y.2d at 141, 603 N.Y.S.2d 807, 623 N.E.2d 1157; *Passalacqua*, 933 F.2d at 138; *Glemby*, 717 F.Supp. at 166.

■ Generally, piercing the corporate veil requires a showing that the parent corporation dominates the subsidiary to such an extent that the latter is really an agent for or instrumentality of the former and the parent corporation used that control to commit fraud or some other wrong that injured the party seeking to pierce the veil. *See American Fuel*, 122 F.3d at 134; *Passalacqua*, 933 F.2d at 137–38 (holding that to pierce the corporate veil (1) the parent must have exercised such control that the subsidiary had become a mere instrumentality of the parent, which is the real actor; (2) such control has been used to commit fraud or other wrong; and (3) the fraud or wrong results in an unjust loss or injury to plaintiff); *Morris*, 82 N.Y.2d at 141, 603 N.Y.S.2d 807, 623 N.E.2d 1157 (holding that piercing the corporate veil requires a showing that (1) the owners exercised complete control of the corporation with respect to the transaction attacked and (2)

such domination was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiff's injury). Domination of the subsidiary by the parent is the key. *See American Fuel*, 122 F.3d at 134; *Passalacqua*, 933 F.2d at 138; *Morris*, 82 N.Y.2d at 141, 603 N.Y.S.2d 807, 623 N.E.2d 1157 (while complete domination is the key, standing alone, it is not enough; a showing of a wrongful or unjust act toward the plaintiff is required).

■ The Second Circuit suggests consideration of the following factors to determine whether disregarding corporate separateness is an appropriate remedy:

(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Passalacqua*, 933 F.2d at 138 (*citing Directors Guild of America v. Garrison Prod.*, 733 F.Supp. 755, 760–61 (S.D.N.Y. 1990)).

### iii. Reverse Veil Piercing in the Present Case

Judge Learned Hand in *Kingston Dry Dock, Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265 (2d Cir.1929), applied the traditional veil piercing or alter ego test to a

non-traditional situation, such as this one, where a subsidiary was sought to be held liable for an obligation incurred by its parent. *See id.* at 267. Although the court determined not to pierce the veil, Judge Hand noted that applying the traditional test to the reverse situation was problematic because it is factually difficult for a subsidiary to act for the parent or control its actions yet recognized that "it would be too much to say that a subsidiary can never be liable for a transaction done in the name of a parent." *Id.* So reverse veil piercing may be rare, as the defendants point out, but not impossible. *See Thomson McKinnon,* 149 B.R. at 73 (recognizing *Mid–West Metal* as a proper application of reverse veil piercing); 1 FLETCHER CYC. CORP., § 43.60, p. 781 (Perm. ed.1990).

Courts that have encountered reverse veil piercing in parent/subsidiary scenarios have extrapolated from Judge Hand's comments that, to accommodate the differences between the traditional and non-traditional veil piercing situations, the domination requirement of the traditional test needs to be relaxed in favor of finding a control relationship between the parent and the subsidiary. *See* FLETCHER, § 43.60 at 781 ("It is more appropriate in these cases to require, as a necessary but not sufficient condition for finding liability, only that there be a control relationship between the parent and the subsidiary."); *Mid–West Metal,* 13 B.R. at 567 (*citing FMC Finance Corp. v, Murphree,* 632 F.2d 413, 422 (5th Cir.1980) and *G.M. Leasing Corp. v. United States,* 514 F.2d 935 (10th Cir.1975), *aff'd in part and rev'd in part on other grounds,* 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977) (holding corporation liable for taxes of its general manager because he exerted substantial if not exclusive control over the corporation)); *cf. American Fuel,* 122 F.3d at

134–135 (requiring control to the extent that corporate funds were used for personal matters and funds intermingled in the corporation/shareholder situation); *Easton,* 647 N.Y.S.2d at 909, (where the general rule of domination as enunciated in *Morris* and *Passalacqua* has been met, the direction of the piercing is immaterial).

 The Complaint alleges that Porush and Belfort were officers and directors of both Stratton and RMS. ¶¶ 23, 25. Although the "commonplace circumstance" of "interlocking directorates" is insufficient on its own to establish the domination or control necessary to have the corporate veil pierced, *see American Protein Corporation v. AB Volvo,* 844 F.2d 56, 60 (2d Cir.1988), the Trustee has alleged many more of the *Passalacqua* factors such that his theory of reverse veil piercing will survive the pleading stage.[22] Stratton and RMS allegedly shared not only the same officers and directors but the same telephone lines, corporate books and records and office space. ¶ 32; *see American Protein,* 844 F.2d at 60 (the Court emphasized that had there been evidence of these factors, such evidence would have supported piercing the veil). The Trustee has pleaded that RMS is but a shell corporation whose only business purpose is to own 100% of Stratton. ¶ 31. *See* 1 FLETCHER, § 41.10 at 616 ("Where a corporate [sic] is a wholly owned subsidiary with identical principal corporate officers, these facts alone might provide sufficient evidence for piercing the corporate veil."). Thus, RMS had no separate business of its own but depended on the business operations of Stratton to function. *See American Protein,* 844 F.2d at 60; 1 FLETCHER, § 43 at 730 (one factor in the traditional veil piercing scenario is where the subsidiary receives no business except that given to it by the parent).

**22.** To the extent that the allegations in the Complaint supporting this reverse piercing theory involve fraud, they must comply with F.R.C.P. 9(b). Otherwise, F.R.C.P. 8(a) governs. Considering that any allegations involv-

ing fraud which are relevant to the present analysis have already been determined to meet the particularity requirements of F.R.C.P. 9(b), *see* section on actual fraud (III. A.), I need not address them again here.

The lines between RMS and Stratton are further blurred by the fact that they were controlled by the same person. *See* 1 FLETCHER, § 43 at 729. RMS had two major shareholders. When Porush bought out Belfort pursuant to the SP Agreement, Porush became the 95% owner of RMS, which derivatively gave him a 95% interest in Stratton. ¶¶ 57, 58. After Belfort resigned as President and then as a director of Stratton, Porush was left alone at the helm of the debtor. ¶¶ 47, 51 and 53. At the same time, Porush effectively gained sole control of RMS as well because, while Belfort was technically still a director of RMS, he had been banned by the SEC from performing any duties in that capacity. ¶¶ 46, 52 and 53. Stratton and RMS, therefore, were basically at the mercy of Porush's will. Further supporting the Trustee's theory is that Stratton, under Porush's direction, advanced the monies to RMS with which to make the NCP Payments to Belfort. ¶¶ 58, 74 and 76. *See* 1 FLETCHER, § 43 at 730 (another factor in the traditional scenario is whether the parent finances the subsidiary). Under the relaxed standard applicable in the reverse veil piercing context, the Trustee has borne his burden of pleading the requisite degree of control.

*In re Mid–West Metal Products, Inc.*, 13 B.R. 562 (Bankr.D.Kan.1981) is a case particularly on point. There, Espy, Inc. ("Espy") was the holding company for the debtor, Mid–West Metal Products, Inc. ("Mid–West"). The only two shareholders of Espy were also officers of Mid–West. Walter Simpson executed an employment agreement with Espy but was actually employed as an executive for Mid–West, Espy having no employees. Mid–West was not a party to nor was it mentioned in the employment agreement; however, the two officers executing the agreement on behalf of Espy signed their names followed by the titles of their positions at Mid–West. Simpson filed a claim for employment benefits, vacation pay and salary after Mid–West filed for bankruptcy and Mid–West objected, claiming it was not liable to Simpson because it was not a party to the original employment agreement. The court explained that the usual domination element required in the traditional veil piercing context was not suitable in the reverse veil piercing situation because it is very rare that a subsidiary actually dominates its parent. *See Mid–West Metal*, 13 B.R. at 567. However, the court focused on whether Mid–West had a control relationship with Espy to the extent that Espy was not the real actor. *See id.* Finding that to be so, the court held that Espy's veil should be pierced in favor of holding Mid–West liable on Espy's debt. The court concluded that Mid–West was the real party to the contract even though it was not named in the body of the employment agreement. *See id.* at 568. The court buttressed its decision with findings that Simpson was clearly hired to work for Mid–West and did in fact work for Mid–West; Espy had no other function except as a holding company for Mid–West; Espy had no employees; and thus, to avoid confusion, the equities favored disregarding the corporate separateness between Espy and Mid–West. *See id.*

Just like Espy, RMS served no business purpose other than to be the holding company for Stratton. RMS, not Stratton, was the signatory to the NCP Agreement however, Belfort was being paid not to compete with Stratton, not RMS, so that Stratton was the recipient of the supposed benefit of the contract. Significantly, Stratton was the party funding the Agreement. It should also be noted that although the Agreement was signed by Porush on behalf of RMS, the computer-generated footer in the agreement identifies Stratton as the source of the document. *See* Exhibit A to the Complaint. Stratton is therefore similar to Mid–West in that it appears to be the real party to the Agreement with RMS being but a conduit through which to effectuate the NCP Payments to Belfort. *See, e.g., In re Best Products Co., Inc.*, 157 B.R. 222, 230 (Bankr.S.D.N.Y.1993) (holding that the

debtor and not one of its subsidiaries, whose name appeared on the loan documents, was the real party to the loan because the latter had no assets and no accounts and was being used only as a vehicle to "get around" certain regulations).

The defendants rely heavily on *In re Thomson McKinnon Securities, Inc.*, 149 B.R. 61 (Bankr.S.D.N.Y.1992), for the proposition that reverse veil piercing is inappropriate here; however, I find that case to be distinguishable on many grounds. That case involved a parent corporate debtor, Thomson McKinnon, Inc. ("TMI") and a subsidiary debtor, Thomson McKinnon Securities, Inc. ("TMSI"), whose relationship to each other is admittedly similar, on its face, to that between Stratton and RMS and Mid–West and Espy. TMI was formed as a holding company for TMSI so that other subsidiaries of TMI could diversify their business endeavors without running afoul of the strict rules and regulations applicable to TMSI as a registered broker dealer. TMI had minimal liquid assets and depended on the operations of its subsidiaries. TMI and TMSI shared many directors but many directors of TMSI were not directors of TMI. Several TMSI directors entered into employment contracts with TMI, but TMSI was not a party to those contracts. The contracts defined TMI as the employer and provided that TMI could cause a subsidiary to pay a director's compensation if that director actually performed work for that subsidiary. Certain directors filed proofs of claim in the TMSI bankruptcy case for employment and fringe benefits. TMSI, like Mid–West and Belfort, objected, arguing that TMSI was not obligated to the director claimants under those contracts. Again, similar to this situation, the director claimants advanced a reverse veil piercing theory to impute TMI's liability under the contracts to TMSI.

The court declined to pierce the corporate veil because the claimants had failed to produce any evidence of fraud or breach of fiduciary duty. *See Thomson McKinnon*, 149 B.R. at 72. Despite the fact that TMI and TMSI shared the same offices and stationary and that TMI had no operations of it own, the court stated that TMI could not be held to be dominated by TMSI inasmuch as TMI admitted to controlling TMSI and conceded that it was liable to the director claimants under the employment contracts. *See id.* at 72–73. Thus, there was no predicate for reverse veil piercing. *See id.* at 72. The court cited *Mid–West Metal* as an example of a proper application of reverse veil piercing theory and went on to distinguish the relationship between TMI and TMSI to the situation in *Mid–West Metal*, reasoning that in *Thomson McKinnon*, it was clear that the officers that signed the employment contracts were officers of TMI and that there was no confusion as to which entity was the real party in interest to the contract. *See id.* at 73.

The facts in *Thomson McKinnon* did not support reverse veil piercing because there was no domination or control of the parent by the subsidiary. It is precisely this lack of domination or control that makes *Thomson McKinnon* distinguishable from the present facts. While TMI and TMSI shared stationary, office space and some directors, TMSI had many other directors that were not also directors of TMI. TMI did not depend exclusively on TMSI's operations because it held many other subsidiaries which represented live businesses. More importantly, TMI admitted to being liable to the director claimants and there was no evidence that TMSI was meant to be liable to the director claimants under the employment contracts. By contrast, here it is alleged that there is almost complete overlap of officers and directors between Stratton and RMS; both companies share many corporate formalities including books and records; RMS' only business purpose is to own 100% of Stratton and no other entity, making RMS wholly dependent on Stratton's

business operations; and Stratton's funding of the NCP Payments indicates that it was intended to be the real party in interest to the Agreement. Perhaps the most important distinction between the two cases is that the Trustee has alleged with particularity that the control relationship between Stratton and RMS was used to perpetrate a fraud whereas the court in *Thomson McKinnon* found no such evidence. *See id.* at 72.

The Complaint pleads all three elements of a reverse veil piercing claim: 1) that Stratton exerted a high degree of control over RMS; 2) that Stratton used this control to defraud Stratton's creditors by virtue of the Agreement and the payments made thereunder to Belfort; and 3) that Stratton's unsecured creditors were injured as a result of Stratton's assets being diverted away from the estate. Accordingly, the Trustee has properly contended that Stratton and RMS should be treated as one entity for purposes of determining whether the Agreement was constructively fraudulent as to Stratton's creditors.

### b. Elements of Constructive Fraud

■ As I have already indicated, the Trustee must allege that Stratton transferred property for less than fair consideration while it was insolvent or which transfer rendered it insolvent, while the debtor suffered from unreasonably small capital or while Stratton knew that it would be unable to pay debts as they became due. The Trustee has satisfied all three elements. He has identified the NCP Payments and alleged that no consideration was given for them because Belfort was legally prohibited from engaging in any activities in the securities industry, which illusory refrain or restraint was supposed to be the consideration for the NCP Agreement, (¶ 64), or at least, that far less than fair consideration was given when the

transactions are viewed as one and the valuation of Stratton/RMS under the SP Agreement is compared with its indirect valuation under the NCP Agreement. ¶ 63. Finally, the Trustee alleges that the NCP Payments rendered Stratton insolvent (¶¶ 13, 39) and prevented the debtor from paying the arbitration awards being entered against it. ¶¶ 67, 68. *See Harvard Knitwear*, 174 B.R. at 21 (under § 273, it is well settled that a conveyance made by a grantor without consideration at a time when debts are outstanding raises a presumption of insolvency). Finally, the Trustee has alleged that for the same reasons that the defendants (except Maxwell) were considered transferees under the actual fraud claims, they remain transferees under the constructive fraud claims.

### 2. Third Claim for Constructive Fraud

■ The Trustee has also pleaded all three elements of constructive fraud with respect to the S & B Payments to Porush. The Trustee identifies actual monies that were transferred to Porush as salaries and bonuses while Stratton was insolvent because they were made after the NCP Agreement was executed. ¶¶ 78–84. The Trustee also alleges that Porush paid himself these excessive salaries and bonuses while customer claims remained outstanding, knowing that if he made the S & B Payments to himself, those customer claims could not be satisfied. ¶¶ 64–68. Lastly, the Trustee alleges that these transfers were not supported by fair consideration because Porush did not perform any services or produce any benefits for Stratton that would merit such inordinate increases in salary and bonuses. ¶ 84. Moreover, there was plainly no consideration given for the S & B Payments made while Porush was banned from engaging in any supervisory duties at Stratton by the SEC. ¶¶ 85, 86.[23]

---

**23.** For the same reasons that Porush and Nancy Porush were deemed to be properly pleaded as transferees under the Second

Claim, they are properly pleaded as transferees under this one.

## IV. The Common Law Claims for Relief

### A. Eighth Claim for Relief: Conversion against Porush

The Trustee alleges that the S & B payments to Porush constitute waste and conversion of Stratton's assets because they were excessive, unreasonable and not equal to the value of the services performed by Porush. Porush argues that these allegations fail to state a claim for conversion under New York law because, at a minimum, the Trustee has not identified the alleged converted funds; has not established that Porush without authority assumed control and exercised a right of ownership over these funds; and has not established that any other parties had an ownership right to or were precluded from exercising an ownership right in these funds.

■■■■ In New York, the common law tort of conversion is the "unauthorized exercise of dominion over the property of another to the exclusion of the owner's right, or the unauthorized use of that property." *Maxwell Macmillan Realization Liquidating Trust v. Aboff (In re Macmillan, Inc.)*, 204 B.R. 378, 404 (Bankr. S.D.N.Y.1997) (*quoting Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp.*, 923 F.Supp. 439, 447 (S.D.N.Y.1995)); *see ESI, Inc. v. Coastal Power Production Company*, 995 F.Supp. 419, 433 (S.D.N.Y.1998) (conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights); *Vigilant Ins. Co. v. El Paso Housing Auth.*, 87 N.Y.2d 36, 44, 637 N.Y.S.2d 342, 660 N.E.2d 1121 (1995) (same). Where the allegedly converted property is money, a complaint is insufficient unless the claimant alleges that he or she had "ownership, possession or control of the money before its conversion," *ESI*, 995 F.Supp. at 433 (*citing Aramony v. United Way*, 949 F.Supp. 1080, 1086 (S.D.N.Y.1996)), and is therefore entitled to immediate possession of those specifically identifiable funds. *See Ehrlich v.*

*Howe*, 848 F.Supp. 482, 492 (S.D.N.Y. 1994); *Macmillan*, 204 B.R. at 405 (where the property is money, it must be specifically identifiable and subject to an obligation to be returned or to be otherwise treated in a particular manner); *Key Bank v. Grossi*, 227 A.D.2d 841, 642 N.Y.S.2d 403, 405 (1996) (same); *Republic of Haiti v. Duvalier*, 211 A.D.2d 379, 626 N.Y.S.2d 472, 475 (1995); *Payne v. White*, 101 A.D.2d 975, 477 N.Y.S.2d 456, 458 (1984) (court found that money was properly the subject of a conversion action where the converted funds could be identified as a segregated chattel and traced to a specific bank account). Conversion does not lie where a claimant merely seeks to enforce an obligation to pay money. *See Ehrlich*, 848 F.Supp. at 492.

■■■■ The Trustee must plead conversion with particularity inasmuch as the claim is based on the monies Porush fraudulently siphoned out of Stratton as the S & B Payments. The Complaint alleges that Porush committed an unauthorized exercise of dominion over Stratton's property by paying himself millions of dollars in S & B payments from Stratton's coffers to the exclusion of Stratton's creditors at a time when Stratton was insolvent. ¶¶ 78–85. The Trustee identifies the specific amounts of cash and stocks comprising the S & B Payments, the date on which Porush transferred this property to himself and the origin of these monies and stocks as Stratton's assets. ¶¶ 78–84. The Trustee alleges that every single S & B Payment precluded Stratton's legitimate creditors, such as those customers who had asserted $30 to 40 million in claims against Stratton, from being paid. ¶ 85. In addition, the Complaint alleges, even if Porush could show entitlement to the S & B Payments, those made during Porush's year-long SEC-imposed suspension from working in the securities industry were clearly an unauthorized use of Stratton's assets, (¶ 81), and not equivalent in value to any of the services Porush rendered to Stratton. ¶¶ 55, 85. The Trustee has not only met

his burden of particularity by giving Porush adequate notice of the nature of the conversion claim against him, but has pleaded all of the elements of conversion, including identifying the specific sums of money and stocks allegedly converted[24], why the S & B Payments were unauthorized and how the S & B Payments were an exercise of ownership by Porush over those funds to the exclusion of Stratton's customer creditors. *Cf. Macmillan*, 204 B.R. at 405–06 (court dismissed conversion claim because the plaintiff could not link the defendant to the misappropriation of the refund checks and wire transfers which deprived creditors of what rightfully belonged to them).

### B. Ninth and Tenth Claims for Relief against Maxwell Belfort

The Ninth Claim is for breach of fiduciary duty based on Maxwell's role in the execution and delivery of the SP and NCP Payments while the Tenth Claim is for aiding and abetting the breaches of fiduciary duty allegedly committed by Porush and Belfort. Maxwell moves to dismiss both claims for failure to plead in accordance with F.R.C.P. 9(b), labeling as deficiencies 1) the Trustee's failure to allege that Maxwell held a formal position with Stratton, 2) the Trustee's pleading that Maxwell was an officer or director of Stratton without specifying when and 3) the Trustee's failure to identify which fiduciary duties were breached, how they were breached or when those breaches occurred with the requisite particularity in order for Maxwell to defend himself.[25]

Maxwell also seeks dismissal of the Ninth Claim on the theory that officers of a parent corporation owe no fiduciary duty to the subsidiary. With respect to the Tenth Claim, its dismissal is warranted, he says, because it is a cause of action for aiding and abetting a fraudulent transfer, which is not cognizable under New York law where the defendant was not the recipient or transferee of any of the fraudulently transferred funds. At most, he says, he is guilty of having assisted in the transfers but that assistance alone does not lay the foundation for an "aiding and abetting" cause of action.

Although Maxwell does not identify standing as the underlying problem, whether or not the Trustee has standing is the linchpin to the survival of these claims. And that, in turn, rests on whether Maxwell is a fiduciary of Stratton or a mere third party from whom the Trustee seeks a recovery. *See The Mediators, Inc. v. Manney (In re The Mediators, Inc.)*, 105 F.3d 822, 826–27 (2d Cir.1997) (holding that a bankruptcy trustee has standing to pursue, on behalf of the debtor, under New York law, an action for breach of fiduciary duty against the debtor's fiduciaries); *Solow*, 994 F.Supp. at 178, 180–81 (noting that in *The Mediators*, the Second Circuit distinguished aiding and abetting claims against third parties from those against corporate fiduciaries, the former belonging to creditors in their own right and the latter belonging to the corporate debtor's trustee in bankruptcy).

#### 1. Breach of Fiduciary Duty

The Trustee alleges that Maxwell was an officer and director of RMS as well as the *de facto* Chief Financial Officer of

---

24. The case law does not specify whether the plaintiff must be able to trace at the time of the conversion, that is, where the funds were initially deposited by the converter, or, rather, at the time of suit. In either event, the Trustee has met his pleading burden, alleging the initial destination of the converted funds and identifying an offshore trust into which they were eventually deposited.

25. Maxwell claims that the Complaint is deficient because it pleads that he prepared financial statements without specifically indicating how or why these contributed to any fraudulent scheme; that he paid Belfort pursuant to the SP and NCP Agreements (whose invoices, according to Maxwell, were fully disclosed) against the advice of Stratton's counsel without identifying why he was bound by that advice, what that advice was or whether it was indeed ever given.

Stratton and that he therefore owed a fiduciary duty to both corporations. ¶¶ 27, 29, 32 and 74. Alternatively, the Trustee says, since Sratton and RMS are alter egos, Maxwell's fiduciary duties as an officer and director of RMS ran to Stratton as well. The purported breach arises from Maxwell's role in signing the checks and/or authorizing the wire transfers which effectuated the S & B, SP, NCP Payments and the excessive salary and bonuses he paid to himself (¶ 15), which harmed Stratton and its creditors. Although the Trustee asserts this claim under the rubric of § 720 of the BCL and §§ 544(b) and 550(a) of the Bankruptcy Code, the reference to §§ 544(b) and 550(a) is misplaced, inasmuch as I have determined that no recovery lies against Maxwell under the latter section. *See Albert v. Carovano,* 851 F.2d 561, 571 n. 3 (2d Cir.1988) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters."). Nonetheless, § 720 of the BCL, which explicitly permits suit by a bankruptcy trustee, *see Scherling v. Rem (In re Princeton Industries, Inc.),* 39 B.R. 140, 142 (Bankr.S.D.N.Y.1984), permits recovery for breach of fiduciary duty obligations by corporate officers and directors. *See id.* (Section 720 is to be broadly construed and is to cover every form of waste of assets and violation of corporate duty. Whether pursuit of relief under § 720 is labeled an accounting or a suit for damages is inconsequential); *cf. Gerdes v. Reynolds,* 28 N.Y.S.2d 622 (Sup.Ct.1941) (Evidence showed that $1.3 million of $2.1 million paid for common stock of corporate investment trust was actually paid for resignations of officers and directors and the directors' election of the purchasers' nominees as their successors. Although much of that sum never passed into the officers' and directors' hands, they were jointly and severally liable for its return because of their participation in a breach of fiduciary duty, even where they were acting only as agents. In addition, the defendants were required to account to the investment trust's bankruptcy trustees for all profits they received and all damages they caused to the trust.)

■■■■■ To successfully plead a claim for breach of fiduciary duty, the Trustee must allege factors establishing the existence of a fiduciary relationship, *see Eickhorst v. E.F. Hutton Group, Inc.,* 763 F.Supp. 1196, 1203 (S.D.N.Y.1990); *Northeast General Corp. v. Wellington Advertising, Inc.,* 82 N.Y.2d 158, 160, 604 N.Y.S.2d 1, 624 N.E.2d 129 (1993), and facts specifying the misconduct or wrongdoing which constitutes the breach of that duty. *See Lippe v. Bairnco Corporation,* 230 B.R. 906, 916 (S.D.N.Y.1999); *Amfesco Industries, Inc. v. Greenblatt,* 172 A.D.2d 261, 568 N.Y.S.2d 593, 595 (1991). Under New York law, officers and directors owe a fiduciary duty to the corporation which they serve. *See Lippe,* 230 B.R. at 916; *H.W. Collections, Inc. v. Kolber,* 682 N.Y.S.2d 189, 190 (1998); *Amfesco,* 568 N.Y.S.2d at 595 (duty to manage the property of the corporation in good faith, according to their best judgment and skill, and in the interest of the stockholders); *Schwartz v. Marien,* 37 N.Y.2d 487, 491, 373 N.Y.S.2d 122, 335 N.E.2d 334 (1975).

■■■ There can be no doubt that the Trustee has alleged the existence of a fiduciary relationship between Maxwell and Stratton because he has alleged that Maxwell acted as the *de facto* Chief Financial Officer of the debtor. ¶¶ 27, 29, 32 and 74; *see Princeton,* 39 B.R. at 142 (the existence of a fiduciary relationship is demonstrated by pleading that defendants were officers and directors of the debtor). The Trustee's additional allegation that, since RMS and Stratton are alter egos of each other, Maxwell, as a designated officer and director of RMS, should also be considered an officer and director of Stratton is equally sufficient because, construing the Complaint in favor of the Trustee as I must, it establishes the basis for finding that a fiduciary relationship existed between Maxwell and Stratton. In other words,

liability for his breach of fiduciary arises from the allegation that Stratton and RMS are alter egos rather than from the fact that Stratton is RMS' subsidiary, as Maxwell suggests.

The Trustee has amply pleaded the facts and circumstances surrounding Maxwell's breach of his fiduciary duty to Stratton. Maxwell voluntarily took an excessive salary and bonuses. ¶ 15. He knew of the S & B Payments and of SP and NCP Agreements (¶¶ 27, 28 and 74); he knew they were fraudulent because he also knew of the discrepancy in the valuation of Stratton as between both Agreements, of Belfort's ban from working in the securities industry (¶ 65), that the value of Porush's services were not equal to the bonuses and salaries he received, of Porush's one year suspension from performing any supervisory role at Stratton (¶ 65), of Stratton's very poor financial condition and its attendant inability to meet the S & B, SP and NCP obligations without forsaking others, and of the outstanding creditor arbitration awards. ¶ 74. Yet, in total disregard of his fiduciary duties to Stratton, pleads the Trustee, Maxwell coordinated and executed both Stratton's and RMS' financial participation in both transactions by issuing checks and authorizing wire transfers to Belfort in furtherance of the SP and NCP Agreements and to Porush in the form of the S & B Payments. ¶¶ 28, 29, 32 and 74; see Lippe, 230 B.R. at 917. These acts, if proven, clearly harmed Stratton and its creditors by depriving them of what was property theirs. See Amfesco, 568 N.Y.S.2d at 595. Accordingly, the breach of fiduciary claim against Maxwell withstands his motion to dismiss.

2. Aiding and Abetting a Breach of Fiduciary Duty

Whereas I agree with Maxwell that a cause of action for aiding and abetting a fraudulent transfer does not lie under New York law against a person who is not alleged to be the recipient or transferee of the fraudulently conveyed assets, see

*Federal Deposit Insurance Corporation v. Porco*, 75 N.Y.2d 840, 842–43, 552 N.Y.S.2d 910, 552 N.E.2d 158 (1990), and whereas I have already determined that Maxwell does not fall within the aegis of § 550(a) because he is not alleged to be a transferee of the SP, NCP and S & B Payments, I disagree with Maxwell's characterization of the Tenth Claim as one for aiding and abetting a fraudulent transfer; it is a claim for aiding and abetting a breach of fiduciary duty. His actions not only enabled the fraudulent transfers by physically making the S & B and NCP Payments to Porush and Belfort, respectively, but facilitated Porush' and Belfort's breaches of their fiduciary duties to Stratton by helping them denude Stratton of its assets and thereby deprive Stratton's creditors of their property. As officers and directors of the debtor, Porush and Belfort owed Stratton a fiduciary duty of good faith, loyalty and management of its business in the best interests of Stratton, and of its creditors once Stratton became insolvent. *See Macmillan*, 204 B.R. at 405; *Amfesco*, 568 N.Y.S.2d at 595. Plainly, the SP and NCP Agreements as well as the post-insolvency Board authorizations for the S & B Payments, as alleged, were at odds with those duties. Without Maxwell's participation, Porush and Belfort could not have successfully transferred the monies which made up the NCP Payments from Stratton through RMS to Belfort, nor could Porush have awarded himself the S & B Payments.

New York recognizes a claim for aiding and abetting a breach of fiduciary duty. *See Goldin v. Primavera Familienstiftung TAG Associates, Ltd. (In re Granite Partners, L.P.)*, 194 B.R. 318, 328 (Bankr.S.D.N.Y.1996); *Crowthers McCall*, 129 B.R. at 999; *cf. Atlanta Shipping*, 818 F.2d at 250–51 (New York common law recognizes a cause of action for aiding and abetting wrongful diversion of funds). A plaintiff must allege three elements: (1) the fiduciary breached his obligations to another, (2) the defendant knowingly par-

ticipated in the breach, and (3) the plaintiff suffered damages as a result of the breach. *See Centennial Textiles,* 227 B.R. at 611 (*citing Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.,* 157 F.3d 933, 943 (2d Cir.1998)) (in the context of a post-petition fraudulent transfer); *Crowthers McCall,* 129 B.R. at 999 (slightly different variation of the same test including that the defendant's conduct gave substantial assistance or encouragement to the fiduciary's wrongful conduct); *cf. Atlanta Shipping,* 818 F.2d at 251 (a plaintiff must show that the defendant knowingly completed acts with the purpose of aiding and abetting the accomplishment of an illegal scheme). The Trustee need not show that Maxwell acted with intent to harm Stratton or its creditors. *See Centennial Textiles,* 227 B.R. at 611 (*citing S & K Sales Co. v. Nike, Inc.,* 816 F.2d 843, 848 (2d Cir.1987)).

■ The Complaint is replete with allegations that Porush and Belfort were fiduciaries who breached their fiduciary duties to Stratton by entering into the SP and NCP Agreements and by making the S & B Payments. The Trustee further alleges that Maxwell knew that Porush and Belfort were fiduciaries of Stratton, that the S & B, SP and NCP transactions represented a breach of Porush's and Belfort's fiduciary duties, and that Maxwell affirmatively and substantially assisted Porush and Belfort in completing those transactions. ¶¶ 27, 28, 29, 65 and 74; *see Centennial Textiles,* 227 B.R. at 612 (*citing Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 282–84 (2d Cir. 1992)) ("A person knowingly participates in a breach of fiduciary duty if he (1) knows that the primary violator is a fiduciary, (2) knows that the primary violator's conduct is a breach of his fiduciary duty, and (3) affirmatively assists or conceals the breach."). Lastly, it is beyond cavil that the Trustee has alleged that Stratton suffered damages as a result of the S & B, SP and NCP transactions. The Tenth Claim

therefore is adequately pleaded and will not be dismissed.

**C. Eleventh Claim for Relief: Conspiracy to Breach Fiduciary Duties**

The Trustee's Eleventh Claim for Relief alleges that Porush, Belfort and Maxwell conspired to breach their fiduciary duties to Stratton through manipulation, mismanagement, and usurpation of Stratton, self-dealing by its principals, officers and directors, and resulting unjust enrichment and corporate waste, all of which were allegedly occasioned by or a direct result of the SP and NCP Agreements and the S & B payments. Belfort, his father and Porush argue that these claimed breaches are already reflected in the Fifth, Sixth, Seventh (all three of which are unchallenged), Ninth and Tenth Claims for relief, the first against Belfort, the second two against Porush and the third two against Maxwell. The Eleventh Cause of Action, assert the trio, merely adds that they conspired to commit the foregoing breaches of fiduciary duty and, therefore, standing alone, is not actionable under New York law because the underlying acts to which this claim for civil conspiracy attaches have already been alleged in the form of separate and distinct claims against the individual defendants.

■ A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose. *See Borden v. Spoor Behrins Campbell & Young,* 828 F.Supp. 216, 225 (S.D.N.Y.1993). "The charge of conspiracy in an a civil action is merely the string whereby the plaintiff seeks to tie together those who, acting in concert, may be held responsible in damages for any overt acts or acts." *Powell v. Kopman,* 511 F.Supp. 700, 704 (S.D.N.Y. 1981) (*quoting Rutkin v. Reinfeld,* 229 F.2d 248, 252 (2d Cir.), *cert. denied,* 352 U.S. 844, 77 S.Ct. 50, 1 L.Ed.2d 60 (1956)). New York courts do not recognize an independent cause of action for civil conspiracy. *See Banca Commerciale Italiana, N.Y. v. Northern Trust Intern. Banking*

*Corp.*, 160 F.3d 90, 93 (2d Cir.1998); *Durante Bros. & Sons, Inc., v. Flushing Natl. Bank*, 755 F.2d 239, 251 (2d Cir.1985); *ESI*, 995 F.Supp. at 434; *Hoag v. Chancellor, Inc.*, 246 A.D.2d 224, 677 N.Y.S.2d 531, 534 (1998); *Litras v. Litras*, 254 A.D.2d 395, 681 N.Y.S.2d 545, 546 (1998); *Ahmed v. National Bank of Pakistan*, 572 F.Supp. 550, 554 (S.D.N.Y.1983). Notwithstanding this general rule, a few cases have recognized a limited tort of conspiracy "to do an unlawful thing, or to do a lawful thing in an unlawful manner." *Ahead By A Length*, 100 B.R. at 170 (quoting *Arlinghaus v. Ritenour*, 622 F.2d 629, 639 (2d. Cir.), *cert. denied*, 449 U.S. 1013, 101 S.Ct. 570, 66 L.Ed.2d 471 (1980)); *see Lippe*, 230 B.R. at 918 (plaintiff must plead wrongful conduct constituting an independent tort); *Ahmed*, 572 F.Supp. at 554. This exception permits a plaintiff to recover for the overt acts committed in carrying out the conspiracy's wrongful purpose or goal but not for the mere act of conspiring in and of itself. *See Ahead By A Length*, 100 B.R. at 170 (citing *Sterling Nat'l Bank & Trust Co. v. Federated Dep't Stores, Inc.* 612 F.Supp. 144, 146 n. 1 (S.D.N.Y.1985)).

▪ Since New York courts do not recognize an independent cause of action for civil conspiracy, the Eleventh Claim can lie only if it alleges, in addition to the conspiracy, independent overt acts undertaken in pursuit of that conspiracy. Here, the overt acts alleged by the Trustee are the breaches of fiduciary duty; however, they are already embodied in the Complaint's Fifth, Sixth, Seventh and Ninth Claims for Relief asserted against Porush, Belfort and Maxwell, respectively. Accordingly, the Eleventh Cause of Action is duplicative of those claims and should be dismissed. *See ESI*, 995 F.Supp. at 434; *Durante Bros.*, 755 F.2d at 251 (the court dismissed a civil conspiracy claim as duplicative of other claims); *Ahmed*, 572 F.Supp. at 554 (conspiracy claim was duplicative of other

claims and therefore dismissed); *cf. Ahead By A Length*, 100 B.R. at 170 (court allowed a claim of conspiracy to commit conversion because the underlying tort of conversion was barred by the statute of limitations and therefore was not duplicative).

### D. The Equitable Claims for Relief: Twelve and Thirteen

▪ Claiming he has no adequate remedy at law, the Trustee seeks the imposition of a constructive trust and an accounting from all the defendants.[26] A party may state as many separate claims for relief or defenses as he or she wishes regardless of their consistency with each other and of whether they are based on legal or equitable grounds. *See* Fed. R.Civ.P. 8(e)(2); *ESI* 995 F.Supp. at 436 (Federal Rules permit alternative pleading of a constructive trust claim and one for contract damages); *Prudential Oil Corporation v. Phillips Petroleum Company*, 418 F.Supp. 254, 257 (S.D.N.Y.1975), *aff'd*, 392 F.Supp. 1018 (S.D.N.Y.1975) (the court stated that an accounting of partnership assets and a claim for damages arising from a breach of a partnership agreement are alternative remedies which can be sought in the same action); *Lichtyger v. Franchard Corporation*, 18 N.Y.2d 528, 538, 277 N.Y.S.2d 377, 223 N.E.2d 869 (1966) (when a plaintiff seeks both money damages and equitable relief, the courts ordinarily will not entertain a motion to dismiss solely that portion of the complaint which asks for the equitable remedy); *Darlagiannis v. Darlagiannis*, 48 A.D.2d 875, 369 N.Y.S.2d 475 (1975) (even though plaintiff may have a legal remedy, she is not precluded from seeking equitable relief).

▪ The defendants argue that where a plaintiff has an adequate legal remedy,

---

**26.** It is not clear from the Complaint or from the briefs whether the constructive trust claim is asserted against Maxwell and consequently whether or not he moves to dismiss it. To avoid confusion, I will assume the Trustee does bring a constructive trust claim against Maxwell and that, he, in turn, moves to dismiss it.

he or she is then precluded from also seeking equitable relief. Indeed, defendants are correct in asserting that, in New York, equitable relief is only available when an adequate legal remedy is not. *See New York TRW Title Insurance v. Wade's Canadian Inn and Cocktail Lounge, Inc.,* 199 A.D.2d 661, 605 N.Y.S.2d 139, 140 (1993); *Ansonia Assoc. v. Ansonia Residents Ass'n,* 78 A.D.2d 211, 434 N.Y.S.2d 370, 374 (1980); *Lichtyger,* 18 N.Y.2d at 537, 277 N.Y.S.2d 377, 223 N.E.2d 869. Such a statement generally reflects a court's determination on the merits that a legal remedy is available thereby precluding any resort to equity lest the plaintiff recover twice or more than his or her share, *See* 1 Coquillette, MOORE'S FEDERAL PRACTICE 3D, § 2.03[3], p. 2–27 (3d ed.1999) (while a complaint may seek both legal and equitable relief, a court may not grant equitable relief unless it first determines that the party seeking equitable relief has no adequate remedy at law).

■ However,

[o]rdinarily, when plaintiffs seek both money damages and equitable relief . . . the courts will not entertain a motion to dismiss solely that portion of the complaint which asks for the equitable remedy. (internal citations omitted). . . . [a] motion to dismiss the complaint will not search out the nature of the relief or judgment to which a plaintiff may be entitled. The application will be denied if the complaint "states a case for relief either at law or in equity."

*Lichtyger,* 18 N.Y.2d at 538, 277 N.Y.S.2d 377, 223 N.E.2d 869 (*citing Advance Music Corp. v. American Tobacco Co.,* 296 N.Y. 79, 84, 70 N.E.2d 401 (1946)). In other words, courts have adopted a "wait and see" approach, retaining jurisdiction in order to mold their judgment to the needs of the case. *See Bartley v. Walentas,* 78 A.D.2d 310, 434 N.Y.S.2d 379, 383 (1980); 1 MOORE'S at § 2.03[2], p. 2–26 (because a federal court has jurisdiction to adjudicate legal, equitable, and admiralty issues, it is not necessary to force a party to elect among different forms of claim until the status of the litigation requires an election). For example, if, after trial, it appears that no adequate legal remedy actually exists, and a valid cause of action for equitable relief has been stated, then the court should entertain the plaintiff's request for such relief. *Cf. Bartley,* 434 N.Y.S.2d at 383 (court denied equitable remedy after trial where an adequate legal remedy existed). This type of approach is particularly well-suited to the case where any damages awarded at trial would compensate for prior breaches but otherwise might not provide an adequate remedy for any continuing breach. *See id.* So, we turn to the sufficiency of the equitable claims.

### 1. Constructive Trust

■ The general rule in New York is that a party claiming entitlement to a constructive trust must ordinarily establish four elements: (1) a confidential or fiduciary relationship, (2) a promise, express or implied, (3) a transfer made in reliance on that promise, and (4) unjust enrichment. *See Koreag v. Refco F/X Assoc., Inc.,* 961 F.2d 341 (2d Cir.1992); *Brand v. Brand,* 811 F.2d 74, 77 (2d Cir.1987); *Simonds v. Simonds,* 45 N.Y.2d 233, 241–42, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978); *A. Brod, Inc. v. SK & I Company, L.L.C.,* 998 F.Supp. 314, 327 (S.D.N.Y.1998); *ESI,* 995 F.Supp. at 436. These factors exist to provide guidance; the absence of one of them does not preclude relief. *See Koreag,* 961 F.2d at 353 (the court noting, on motion for summary judgment, that lack of fiduciary relationship does not automatically defeat claim of constructive trust); *Simonds,* 45 N.Y.2d at 243, 408 N.Y.S.2d 359, 380 N.E.2d 189; *SK & I,* 998 F.Supp. at 328 (same); *ESI,* 995 F.Supp. at 436–37 (*citing United States v. Coluccio,* 51 F.3d 337, 340 (2d Cir.1995)) (the absence of reliance on a promise would not defeat constructive trust claim).

Because equity is not an exact science, the constructive trust doctrine is an equitable one which should not be rigidly applied, but imposed whenever necessary to satisfy the demands of justice. *See Koreag,* 961 F.2d at 353; *Simonds,* 45 N.Y.2d at 241, 243, 408 N.Y.S.2d 359, 380 N.E.2d 189; *SK & I,* 998 F.Supp. at 327; *ESI,* 995 F.Supp. at 436; *Booth v. Booth,* 178 A.D.2d 712, 576 N.Y.S.2d 686, 687 (1991). "What is required, generally, is that a party hold property under such circumstances that in good equity and conscience he ought not to retain it." *Simonds,* 45 N.Y.2d at 242, 408 N.Y.S.2d 359, 380 N.E.2d 189 (*cited in Koreag,* 961 F.2d at 354; *SK & I,* 998 F.Supp. at 327; *ESI,* 995 F.Supp. at 437). However, since the main purpose of a constructive trust is the prevention of unjust enrichment, that factor remains a key requirement for equitable relief, despite the elasticity of the doctrine. *See Koreag,* 961 F.2d at 354; *Simonds,* 45 N.Y.2d at 242, 408 N.Y.S.2d 359, 380 N.E.2d 189.

Certainly, the Trustee has alleged that Belfort and Porush had a fiduciary relationship with Stratton, that with Stratton's insolvency, Belfort and Porush had fiduciary obligations running to Stratton's creditors, *see Unsecured Creditors' Comm. of Debtor STN Enters. v. Noyes (In re STN Enters.),* 779 F.2d 901, 904 (2d Cir.1985); *Clarkson Co. Ltd. v. Shaheen,* 660 F.2d 506, 512 (2d Cir.1981); *New York Credit Men's Adjustment Bureau, Inc. v. Weiss,* 305 N.Y. 1, 7, 110 N.E.2d 397 (1953); 3 FLETCHER CYC. CORP. § 849 (Perm. ed.1994),[27] that there existed at least an implied promise to Stratton's creditors to use Stratton's available assets for the creditors' benefit and that Belfort and Porush were unjustly enriched by the SP, NCP and S & B Payments. Although the Trustee has not explicitly shown a transfer made in reliance on the promise just mentioned, one could construe monies advanced by Stratton customers to Stratton as transfers made in reliance on Stratton's implied promise to them. In any event, the unjust enrichment and the first two factors would be sufficient to warrant the imposition of a constructive trust on the assets of Porush and Belfort. *See ESI,* 995 F.Supp. at 437.

More troublesome is the Trustee's desire to impose a constructive trust on the assets of Maxwell, Nadine and Nancy. Although the Trustee, in passing, pleads that Maxwell paid himself excessive salaries and bonuses, he does not plead that Maxwell (as opposed to Porush or Belfort) authorized those payments or that Maxwell, without authority from Porush or Belfort, made those payments to himself. Neither does the Trustee allege that the payments were skimmed from the up-streamed Stratton funds intended for the payments to Belfort. I have already found that the Trustee has failed to plead Maxwell was a transferee, thereby making it very difficult to conclude that he was unjustly enriched, not having received any money or benefit from the challenged transfers. Absent an unjust enrichment in particular and a transfer made in reliance on a promise, whose existence I question for the same reasons I stated earlier, the Trustee has not pleaded the requisites for imposition of a constructive trust on Maxwell's assets.

Admittedly, Nancy and Nadine are not fiduciaries of Stratton, nor have they made any express or implied promises to Stratton or its creditors. Clearly, if the underlying promise does not exist, then a transfer in reliance on that absent promise cannot exist either. At most, the wives have been unjustly enriched by the transfer of the SP, NCP and S & B Payments to them by their husbands. That the Trustee does not allege the wives were

---

**27.** Under New York law, a director's fiduciary duty runs to creditors when the corporation becomes insolvent. However, and no New York case holds to the contrary, Delaware law holds that this same duty begins to run as soon as the corporation approaches insolvency. *See Geyer v. Ingersoll Publications Co.,* 621 A.2d 784, 787 (Del.Ch.1992).

unjustly enriched, in the sense that they purposely and wrongfully took financial advantage of Stratton, is of no moment because unjust enrichment "does not require the performance of any wrongful act by the one enriched." *Koreag*, 961 F.2d at 354 (*citing Simonds*, 45 N.Y.2d at 242, 408 N.Y.S.2d 359, 380 N.E.2d 189). All that matters is that they ended up with property that, rightfully, they should not possess. *See Koreag*, 961 F.2d at 354; *Simonds*, 45 N.Y.2d at 242, 408 N.Y.S.2d 359, 380 N.E.2d 189; *SK & I*, 998 F.Supp. at 327.

■■■ Subsequent transfers of the alleged trust property do not preclude the imposition of a constructive trust, if equity would otherwise require that one be impressed on the subsequent transferees. *See SK & I*, 998 F.Supp. at 327. Where there is unjust enrichment and the third party transferees are not *bona fide* purchasers of the property, trust property can be traced into the hands of those third party transferees despite the absence of a fiduciary relationship upon which the initial constructive trust was premised. *See Simonds*, 45 N.Y.2d at 242, 408 N.Y.S.2d 359, 380 N.E.2d 189 (gratuitous donee, however innocent, does not take free of constructive trust); *SK & I*, 998 F.Supp. at 327 (*citing Hazlett v. Fusco*, 177 A.D.2d 813, 576 N.Y.S.2d 427, 429 (1991)). By alleging that the wives are the settlors of offshore trusts which hold property allegedly given to them by their husbands but which, instead, rightfully belongs to Stratton, the Trustee has pleaded unjust enrichment by Nancy and Nadine as well as their status as donees rather than as *bona fide* purchasers. As a result, if he proves what he has alleged, the Trustee may trace the trust property to the wives and impress a constructive trust upon that property.

### 2. Accounting

■■■ In seeking an accounting, the trustee must allege the following conditions in the Complaint: (1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him or her a burden of accounting; (3) that there is no adequate legal remedy; (4) and in some cases, not relevant here, a demand for an accounting and a refusal. *See Pressman v. Estate of Steinvorth*, 860 F.Supp. 171 (S.D.N.Y. 1994); *ESI*, 995 F.Supp. at 436 (the right to an accounting is premised upon the breach of a confidential or fiduciary relationship with respect to property in which the plaintiff has an interest); *300 Broadway Realty Corp. v. Kommit*, 37 Misc.2d 325, 235 N.Y.S.2d 205, 206 (Sup.Ct.1962). The Trustee bears the burden of establishing a partnership, joint venture, or fiduciary relationship. *See Moscatelli v. Nordstrom*, 40 A.D.2d 903, 337 N.Y.S.2d 575, 576 (1972) (an employment relationship is not a fiduciary relationship, therefore, an accounting action will not prevail); *Sugarman v. Weisz*, 34 A.D.2d 763, 310 N.Y.S.2d 394 (1970); *Top All Varieties v. Raj Development*, 173 A.D.2d 604, 570 N.Y.S.2d 184, 185 (1991) (court dismissed a cause of action for an accounting because the tenant failed to establish a fiduciary relationship between the parties); *Adam v. Cutner & Rathkopf*, 238 A.D.2d 234, 656 N.Y.S.2d 753, 759 (1997) (same); *Kaminsky v. Kahn*, 20 N.Y.2d 573, 582, 285 N.Y.S.2d 833, 232 N.E.2d 837 (1967) (no accounting where transaction between parties was a contract of sale and did not establish a fiduciary relationship).

■■ As clear as it is that a fiduciary relationship exists between Stratton on the one hand and Porush, Belfort and Maxwell on the other, it is equally as plain that none exists between Stratton and Nancy and Nadine. Assuming, without deciding, that there exists no adequate remedy at law, the wives have been entrusted with property by their husbands but not by Stratton, so the accounting action against them must be dismissed.

The result differs, however, with respect to Maxwell, Porush and Belfort. Although Maxwell may not have received funds himself from Stratton, as its *de facto* Chief

Financial Officer, he certainly was entrusted with Stratton's assets and can be held accountable for their disposition while under his supervision and control. Porush and Belfort were entrusted with the SP, NCP and S & B Payments, property allegedly belonging to Stratton and its creditors for which they can be directed to account to the Trustee.

### E. Regulatory Action References

Two of the paragraphs in the Complaint (¶¶ 89 and 90) refer to state civil actions and administrative proceedings brought principally against Belfort and Porush. Paragraph 89 alleges that Porush was mismanaging Stratton and that, as a result, he was repeatedly fined, censured and suspended by the SEC, the National Association of Securities Dealers ("NASD") and several state securities regulators. ¶ 89. Paragraph 90 lists the instances of state, NASD and SEC reprimand, including that Porush was enjoined for violating the March 17, 1994 SEC Consent Order (¶ 90(3)) and that, on December 6, 1996, the NASD expelled Stratton from membership and banned Porush from the securities industry for life. ¶ 90(18). The defendants request that these references be stricken because they are prejudicial to them, explaining that the state, NASD and SEC actions were settled on consent, without the defendants ever "admitting or denying" any of the allegations asserted against them. Further, none of the orders resolving those actions contains any findings of fact or law so that reference to those actions in this Complaint, argue the defendants, cannot have any probative effect or evidentiary value.

■■■ Although motions to strike are generally disfavored, see *Eskofot A/S v. E.I. Du Pont De Nemours & Company*, 872 F.Supp. 81, 93 (S.D.N.Y.1995) (citing *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir.1976)); *Morse v. Weingarten*, 777 F.Supp. 312, 319 (S.D.N.Y.1991) (especially if the presence of the material will not prejudice the mov-

ing party), F.R.C.P. 12(f) states that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." F.R.C.P. 12(f); see *Morse*, 777 F.Supp. at 319. When faced with a motion to strike portions of a pleading on the grounds of impertinence and immateriality, the motion should be denied unless "it can be shown that no evidence in support of the allegation would be admissible." *Lipsky*, 551 F.2d at 893; see *Eskofot*, 872 F.Supp. at 94.

■■■ The Second Circuit has clearly held that consent judgments, such as these, are not the result of actual adjudications on the merits and therefore can not be used as evidence in subsequent litigation between the parties. See *Lipsky*, 551 F.2d at 893. But there is a more compelling reason why the allegations relating to fines, censures and consent judgments should be stricken. Not only do they have no bearing on the SP, NCP and S & B Payments, Paragraph 91 states that "[t]o the extent that any fine or payment described above may be recovered by the Trustee, the Trustee reserves the right to do so by bringing & a separate action." ¶ 91; see *Morse*, 777 F.Supp. at 319 (neither Milken's income or the outcome of criminal case bore remotely to the merits of the civil case). In other words, the Trustee does not now seek to recover any damage caused to Stratton by the actions of Porush and Belfort which may have caused the imposition of fines, censures and consent judgments. The general allegations of mismanagement (the first sentence of ¶ 89) may remain, however, because They are material to the breach of fiduciary duty and mismanagement claims against Porush. Similarly, the allegations in ¶¶ 90(3) and (18) regarding the SEC and NASD ban, respectively, are clearly relevant to the propriety of the S & B Payments to Porush. Thus, except for the three sentences just mentioned, the remainder of paragraphs 89 and 90 should be stricken.

## V. Conclusion

The Trustee is directed to SETTLE ORDER consistent with this decision. To the extent that he has been granted leave to replead, he is to do so within 20 days of entry of an order resolving these motions.